The Nestle Company, Inc. (Formerly: Nestle's Milk Products, Inc.) v. Commissioner. The Nestle Company, Inc. (Successor to Nestle's Chocolate Company, Inc.) v. Commissioner.
Nestle Co. v. Commissioner
Docket Nos. 73051, 73052.
United States Tax Court
T.C. Memo 1963-14; 1963 Tax Ct. Memo LEXIS 329; 22 T.C.M. (CCH) 46; T.C.M. (RIA) 63014; January 16, 1963
*329 Held, licensing agreements between petitioner and its parent organization for petitioner's use of patented or secret processes developed by the parent organization for making an instant coffee (Nescafe), an instant cocoa milk drink (Quik), and an acidified baby food milk product (Pelargon) were bona fide and valid, and the royalties paid by petitioner to its parent organization under the terms of the licensing agreements were reasonable in amount and deductible by petitioner as ordinary and necessary business expense. J. Marvin Haynes, Esq., N. Barr Miller, Esq., and Arthur H. Adams, Esq., for the petitioner. John J. O'Toole, Esq., and Warren S. Shine, Esq., for the respondent. DRENNEN
Memorandum Findings of Fact and Opinion DRENNEN, Judge: Respondent determined deficiencies in petitioner's income tax as follows: Docket
Taxable year
No.
Petitioner
ended Dec. 31,
Deficiency
73051
The Nestle Company, Inc. (Formerly:
1947
$ 500,873.64
Nestle's Milk
Products, Inc.)
1948
575,777.11
1949
733,601.80
1950
733,832.04
1951
1,387,227.34
1952
967,212.98
73052
The Nestle Company, Inc. (Successor to
1950
70,357.95
Nestle's
Chocolate Company, Inc.)
1951
none
Jan. 1 to
127,996.87
Mar. 31, 1952
The cases were consolidated for trial *330 and opinion. The sole issue remaining for decision is whether certain amounts paid by petitioner to its parent corporation or members of its parent organization as royalties ic connection with the manufacture and sale by petitioner, as licensee of various patents and processes held and developed by its parent organization, of a soluble coffee under the trademark "Nescafe" or "Nestle's Instant Coffee," a cocoa powder under the trade name "Quik" or "Nestle's Quik," and a pharmaceutical milk powder under the trade name "Pelargon," are deductible by petitioner as ordinary and necessary business expenses. Respondent determined that the entire amount of the royalties paid and claimed by petitioner was not deductible under section 23(a)(1)(A) or any other provision of the Internal Revenue Code of 1939. Findings of Fact Petitioner is a corporation organized under the laws of the State of New York on November 30, 1912, as Nestle's Food Company, Inc. Its name was changed to Nestle's Milk Products, Inc., on August 14, 1930, and on April 5, 1948, was changed to the Nestle Company, Inc. Prior to October 1, 1950, petitioner's principal office was located in New York City. On or about such date, *331 its principal office was moved to Colorado Springs, Colorado, and on June 13, 1952, to White Plains, New York. Petitioner filed its income tax returns for the years 1947 to 1949, inclusive, and for the year 1951 with the collector of internal revenue for the Third District, New York; for the year 1950 with the collector of internal revenue, Denver, Colorado; and for the year 1952 with the director of internal revenue, Albany, New York. Petitioner at all times here material kept its books and records and reported its income on an accrual method of accounting for calendar years. For the years 1947-1952, which are here in issue, it paid no excess profits tax. Petitioner reported on its income tax return for 1951 excess profits tax due of $224,713.80, but payment of this tax was abated by virtue of an unused excess profits credit carry-back from the calendar year 1952. It paid the following amounts of income tax: Years
Income Tax
1947
$1,323,492.88
1948
960,004.46
1949
1,900,849.38
1950
1,294,165.20
1951
2,662,198.51
1952
1,198,285.08
Petitioner paid income and excess profits taxes for each of the years 1941 to 1945, inclusive. It paid no excess profits tax for the year 1940. Until sometime in 1937, *332 all of petitioner's outstanding stock was owned by Nestle Alimentana (Ste. An.) (hereinafter referred to as Alimentana). Alimentana is a publicly held corporation organized in 1905 under the laws of Switzerland with its principal office at Vevey, Switzerland. It is the parent corporation of the worldwide Nestle organization. Alimentana has never maintained offices in the United States, nor during the period from 1938 to the present time did it file United States income tax returns. Alimentana owned Afico, S. A. (formerly known as Societe D'Etudes et Applications Industrielles), a Swiss corporation engaged in research and development work in the food and pharmaceutical industries. Afico never maintained offices in the United States nor filed United States income tax returns. On October 27, 1936, Alimentana caused to be organized under the laws of Panama, a corporation known as Unilac, Inc. Unilac was organized for the purposes, inter alia, of developing new initiatives in food specialties such as soluble products in powder form for the American and non-European market; and to remove from Swiss ownership the stocks, debts, and assets owned by Alimentana in the Western Hemisphere as *333 well as any other assets in any part of the world which appeared to be subject to seizure by Germany in the event that that nation conquered all of Europe, including Switzerland. Unilac has outstanding two classes of stock - voting founders' shares, which at all times have been owned or held for the account of Alimentana, and nonvoting common shares, which are interlocked with the publicly held shares of Alimentana so that each share of Alimentana stock has attached to it a share of Unilac stock. Alimentana transferred to Unilac all of its properties in North and South America and all of its sterling area securities and obligations. Among the properties transferred to Unilac was all the stock of petitioner, which Unilac continued to hold at all times here material. Unilac maintained an office in the United States at Stamford, Connecticut. It filed United States corporate income and excess profits tax returns for the calendar years 1941 to 1952, inclusive, as a resident foreign corporation and such returns have been audited by the Internal Revenue Service and accepted on that basis. Since its incorporation, Unilac has been engaged in various corporate management activities and in holding *334 the securities of other corporations engaged in all phases of the food business and related businesses, including corporations engaged in research and development activities in the food industry. In addition to petitioner, Unilac owned General Patents Holding Co., a Delaware corporation which acquired and held title to various patents and industrial processes; Inredeco, Inc. (Panama), a Panamanian corporation engaged in research and development work; and Inredeco, Inc. (Delaware), a Delaware corporation also engaged in research and development work which, on December 29, 1949, succeeded to the properties of Inredeco, Inc. (Panama). At all times material to this case the president of petitioner was Daniel F. Norton, now deceased. The directors and managers of the worldwide Alimentana organization had confidence in Norton and he exercised considerable personal control over petitioner's operations. Commencing in 1932, Max Rudolph Morgenthaler, of Afico, began work on the development of a dry coffee powder extract instantly soluble in water and which retained the aroma and flavor of freshly brewed coffee. Sometime in 1936 or 1937, Morgenthaler arrived at a process for making a dry coffee *335 powder of this description. Legal title to this process vested in Afico as assignor of Morgenthaler and as agent or trustee of Alimentana. On February 18, 1937, Afico applied for and was subsequently granted Swiss patent No. 201,940 for a "Process Of Preserving The Aromatic Substances Of A Dry Soluble Coffee Extract. " Early in 1938 the Swiss Nestle organization introduced on the market in Switzerland and other European countries a product made under this process and known as "Nescafe." Soluble coffee products of the same nature as Nescafe had been made and marketed in the United States for some years prior to the development of Morgenthaler's process. Morgenthaler, however, was the first to show how an instant coffee could be made which retained the original aroma and flavor after drying, which had good keeping quality, and which used such features as countercurrent high-temperature extraction, defatting and filtration of coffee extract, deep cooling of the coffee extract after percolation below 50 degrees centigrade, exclusion of air during the extraction, specifying a certain type of grind, and spray drying the extract with carbohydrates [1] added, while retaining the aroma and the *336 flavor. In nontechnical terms, the process for making Nescafe may be described as follows: Green coffee is first roasted and then ground rather coarsely. The ground coffee is then put into a series of percolators which are stainless steel columns. These columns are completely filled with the ground roasted coffee. Hot water is then injected under pressure into the bottom of the first percolator and passes up through it and then down to the bottom of the next percolator and so on through the series of percolators so that a concentrated coffee extract is obtained from the last percolator. The extract is then cooled and to it is added carbohydrates in the same amount as there are coffee solids in the coffee extract. The liquid is then put through a spray drier so that a powder is obtained, which is soluble in water. By verbal agreement Alimentana transferred to Unilac all of its right, title, and interest in the Morgenthaler process for making instant soluble coffee in the American and the overseas markets *337 by early 1937. Title to such properties was held successively by Afico, General Patents Holding Co., Inredeco, Inc. (Panama), or Inredeco, Inc. (Delaware), as agent of Unilac. On January 5, 1937, Unilac instructed Afico to apply for letters patent on the Morgenthaler process and, as its agent, to grant licenses for use of the process to such persons as Unilac might designate. On June 29, 1937, Afico applied to the United States Patent Office for letters patent on the Morgenthaler process. A further application was filed on March 6, 1939. Prior to 1939, petitioner's principal business activity was the manufacture and sale of milk and a variety of milk products, such as evaporated milk, condensed milk, baby food specialties, powdered milk products, and ice cream mixes. Petitioner's margin of profit on sales of such products prior to 1939 was so small that it caused petitioner's management a great deal of concern. About the middle of 1937, Alimentana advised petitioner of the development of Nescafe. Samples of the product were sent from Switzerland, and after examining the product, petitioner's management believed it might be successfully added to petitioner's line of products. They were *338 particularly anxious to have a product with a potentially larger margin of profit than the low-profit-margin dairy products petitioner was then selling. Late in 1937 and early in 1938, petitioner conducted several surveys to determine the potential market in the United States for Nescafe. Coffee was an extremely popular beverage in the United States. Petitioner's surveys indicated there were two or three soluble coffee products similar in nature to Nescafe on the market at that time and that the product known as "G. Washington," which had been on the market for a number of years, was the leader. The surveys indicated that G. Washington sales totaled approximately $3 million a year. Petitioner's survey of the coffee market included comparative tests between Nescafe and G. Washington. The results of those tests indicated an overwhelming preference for Nescafe. A leading chain store conducted one such survey for petitioner using a consumer panel of 1,000 people. In this comparison test, about 75 to 80 percent indicated a preference for Nescafe; 45 or 50 percent indicated that they liked Nescafe as well as the regular coffee they were then using; and some indicated a preference for Nescafe *339 as compared with regular coffee. On the basis of these market surveys, petitioner concluded that Nescafe was a quality product far superior to anything similar then on the market and that the product had a huge potential. On February 24, 1938, petitioner entered into a written agreement with Afico, as Unilac's agent, for the use of Morgenthaler's process for making Nescafe. Under the agreement, petitioner was granted the exclusive right to use this process and sell the product derived therefrom in the United States and/or Canada. It was also to receive all available technical assistance and advice for setting up and operating the process and the benefits of all future research, activities carried on by Afico with respect to this process without payment of additional royalties. In consideration for these rights petitioner agreed to pay Afico a "royalty or license fee" of 4 cents a pound on the first 1,200,000 pounds, 3 cents a pound on the next 600,000 pounds, and 2 cents a pound on any further quantities of the product sold in any 1 year. No royalties or license fees were payable during the 3-year period starting from December 31, 1938. Petitioner had the option to discontinue the *340 use of the process at the end of this 3-year experimental period in which event the agreement would become void and of no force and effect. In the event petitioner chose to continue the use of the process at the end of the 3-year period the agreement was to remain effective until the expiration of any United States letters patent issued on the process or, if no letters patent were issued, until December 31, 1956. Petitioner applied for registration of the trademark "Nescafe" in the United States on June 25, 1938. Pursuant to the provisions of the 1938 agreement, Afico disclosed the Nescafe process to petitioner. Morgenthaler informed petitioner's manufacturing department of the techniques of the process and of problems which were involved in connection with its use. In 1938, R. W. Titus, petitioner's chief chemist in charge of its quality control program, and an engineer from petitioner's staff were sent to Europe to observe and learn the process at the Nescafe factory in Europe. The equipment for manufacturing Nescafe was manufactured in Switzerland according to Morgenthaler's specifications and shipped to petitioner. Drawings, blueprints, and instructions as to how the equipment *341 should be installed were sent to petitioner by Afico. Petitioner installed the equipment for making Nescafe in its plant at Sunbury, Ohio. Early in 1939, after the equipment had been installed, Morgenthaler and two technicians came from Switzerland to instruct petitioner's employees in the manufacture of Nescafe. A great many test runs were made with different degrees of roasts and blends of coffee. Such test runs were not completed until the end of May 1939. At that time, petitioner's management believed they had produced a product which was suitable for marketing. In June and July 1939, petitioner began its market preparations for the sale of Nescafe. It selected heavy-traffic grocery stores in the New York and Philadelphia metropolitan areas where so-called store demonstrations were set up in order to introduce the product to the public. The biggest stumbling block in the early marketing stages was public reluctance to even try a new instant coffee because no instant coffee then marketed was an acceptable substitute for freshly brewed coffee. Consumers, however, did try Nescafe, and the store demonstrations were most successful and indicated a ready acceptance. The immediate marketing *342 problem, after Nescafe went on the market in 1939, was to secure proper distribution, but month after month sales steadily increased. In 1939 and 1940, Morgenthaler was experimenting with a further development of the Nescafe process which involved using water in the extraction process with temperatures in excess of 160 degrees centigrade, going as high as 175 degrees centigrade. The object of these experiments was to improve the efficiency of the Nescafe process by extracting from a given amount of roasted coffee a greater amount of soluble coffee. It was discovered that by using temperatures in excess of 160 degrees centigrade hydrolysis of the coffee bean was obtained, and recoveries of coffee extract increased from about 25 to 27 percent to 30 to 37 percent. The use of the higher temperatures also resulted in certain undesirable properties being extracted and one of the important features of Morgenthaler's experiments in 1939 and 1940 was the development of a process for filtering out these undesired properties. On August 8, 1940, Morgenthaler filed an application for a patent on this process with the United States Patent Office. On July 20, 1943, the Patent Office granted Morgenthaler *343 United States patent No. 2,324,526 on 13 of the claims he made in connection with his application. Claims 6, 9, 10, and 11 described the process originally developed by Morgenthaler in late 1937 or early 1938, including the step wherein carbohydrates are added to the coffee extract before spray drying it to retain the aroma and flavor of coffee. Claims 3 to 5 referred to the use of water temperatures in excess of 160 degrees centigrade during the extraction process. Claims 1, 2, and 5 referred to cooling the extract to below 15 degrees centigrade. Claim 4 described the defatting process. On October 26, 1943, Morgenthaler was granted United States patent No. 2,333,027 covering the filtering phase of the process for making soluble coffee extract. In 1939, 1940, and for many months in 1941, petitioner continued to manufacture Nescafe under the process as originally disclosed to it by Morgenthaler and as set forth in Swiss patent No. 201,940 and in United States patent applications 151,058 and 260,218 filed in 1937 and 1939, respectively. Petitioner's recovery of soluble coffee solids in the production of Nescafe averaged 27.02 percent during 1940. The high-temperature process was disclosed *344 to petitioner in 1940 and it made several test runs using these temperatures. Norton and J. B. Sparks, the manager of petitioner's manufacturing department, were opposed to the use of the high-temperature process, however, because they feared it would damage the quality of petitioner's product. Petitioner gradually increased the temperatures it used for extraction up to a high of 155 degrees centigrade in 1940 but it did not use temperatures of 160 degrees centigrade or above in the commercial, as opposed to experimental, extraction process until August 1941. In January 1941, Hans Konrad Durrenmatt, a chemical engineer who had worked with Morgenthaler in the development of the high-temperature process, was sent to the United States by the Nestle organization to assist petitioner in perfecting the use of this process. Shortly after Durrenmatt's arrival in 1941, Sparks ordered that the temperatures used in commercial production of Nescafe be reduced - thereby lowering the rate of extraction - because of his and Norton's fear of damaging the quality of the product. Petitioner maintained a quality control laboratory at Marysville, Ohio, near its Sunbury plant and from the time of his arrival *345 in January 1941 until July of that year, Durrenmatt worked continually on laboratory experiments at Marysville and on test runs at petitioner's Sunbury plant using the high-temperature process. Test runs using temperatures below 160 degrees centigrade and resulting in a rate of extraction of about 25 percent were compared with extraction runs using temperatures of 160 degrees centigrade to 175 degrees centigrade where the recovery was as much as 35 per cent. By use of such comparison tests, Norton and Sparks were finally convinced that the quality of the product, when produced by the high-temperature process, was not harmed as to aroma and flavor, and by July 1941, they were satisfied that petitioner could safely adopt the high-temperature process in its production of Nescafe. Although petitioner decided to use the high-temperature process in July 1941, the need for additional equipment prevented full production using this process for a year. The use of the high-temperature process required much more precise control in the manufacturing operations and Durrenmatt instructed and trained petitioner's personnel in the use of the process. After the necessary additional equipment was installed *346 petitioner was able to obtain extraction recoveries of 35 to 37 percent, thus reducing considerably the amount of green coffee required to produce an equal amount of Nescafe. Sometime in February 1941, or prior thereto, Norton told Virgil P. Ettinger, who for a number of years had been a financial, tax, and business consultant to both petitioner and Alimentana, that he was not satisfied with the 1938 Nescafe agreement because after 1941 petitioner was obligated to pay royalties whether it made profits or not and in both 1939 and 1940 no profits had been realized. Norton anticipated that as petitioner expanded its distribution of Nescafe it would require enormous expenditures of money for advertising and that such expenses, when added to the royalties which would be payable, might mean petitioner would thus continue to lose money for several years. In February 1941, Ettinger asked Muller, who was president of Unilac and a managing director of Alimentana, how he felt about the 1938 Nescafe agreement. Muller told Ettinger that he was dissatisfied with the provisions of the 1938 agreement because of the advent of the war and its resulting inflation. He said he feared that under the 1938 *347 agreement Unilac would be paid a royalty which might amount to very little because it would be based only on the number of pounds sold and not on the dollar sales price. In February 1941, Ettinger discussed a revision of the agreement with Muller and Norton, both of whom were deceased at the time of trial, and undertook to work out an amendment to the agreement which was acceptable to both parties. The revision of the 1938 agreement, as worked out by Ettinger, and as agreed to by Norton and Muller, was finally embodied in a written amendment executed on August 20, 1941, between petitioner, Inredeco, and [*] Generad Patents Holding Co., which held title to the Nescafe process for Unilac during the years 1940-1941. Such amendment recited that the original period of 3 years for nonpayment of royalties had been considered the time it would require petitioner to market Nescafe profitably and had been understood to be provisional in nature, whereas the sales during 1941 had been so gratifying and remunerative as to justify an adjustment of the royalty provisions, and provided (1) that in lieu of the royalties provided in the 1938 agreement, petitioner would pay a royalty of 5 percent of *348 the net sales price of Nescafe sold in any 1 year, limited, however, to one-third of the net profits derived from such sales; (2) that the experimental period during which petitioner paid no royalties was to be reduced to 2 years so that petitioner became subject to the payment of royalties if it earned profits beginning with the year 1941 rather than 1942; (3) the effective period of the agreement, however, was likewise cut back 1 year so that if no letters patent were issued, it expired on December 31, 1955, rather than December 31, 1956. Ettinger felt the agreement was a reasonable one and that each party had given valuable consideration for the concessions made by the other. Petitioner's facilities for the production of Nescafe, all of which were located in the Sunbury, Ohio, plant, were being operated at full capacity, and before the end or 1941 additional production facilities, were needed. Because of its lack of capacity, petitioner was forced to limit the area in which it marketed Nescafe. By 1942, it distributed and sold the product in New England, through the Middle West, and in Florida, but it could not undertake to market on a national basis. By 1942, petitioner's parent *349 organization had not only developed the new high-temperature extraction process for the manufacture of Nescafe, but had also invented a new method for spray drying liquids having nonliquid ingredients and a new spray drier which could be used in the production of Nescafe, and a process for manufacturing decaffeinated instant coffee, with respect to all of which United States patent applications were pending. In addition, its research had developed processes for making three new food products: Nescasol, a cocoa product which was subsequently patented in the United States on July 10, 1945; Cacsol, a clear food extract made from semiliquid pulpy extracts, which was patented in the United States on June 23, 1942; and powdered cheese, for which a United States patent application was made in July 1942. On September 4, 1942, a new license agreement was entered into between Inredeco and petitioner, effective as of January 1, 1942, covering all processes and equipment for making Nescafe. This agreement granted to petitioner an exclusive license in the United States[2] on the following processes, equipment, and products: (a) Nescafe - United States patent applied for August 8, 1940. (b) New spray *350 drier - United States patent applied for April 24, 1941. (c) A process for manufacturing decaffeinated Nescafe - United States patent applied for July 25, 1942. (d) A process for manufacturing Cacsol - United States patent No. 2,287,444 granted June 23, 1942. (e) A process for manufacturing Nescasol - patent to be applied for. (f) A process for manufacturing powdered cheese - United States patent applied for July 10, 1942. Inredeco agreed to give petitioner all available technical information and assistance with respect to the particulars and methods of application of all of the said processes in order that petitioner could manufacture the products covered by the agreement to the best possible advantage. Petitioner agreed to pay as a royalty or license fee a sum equal to: (1) 10 percent of the net sales price of the first 3 million pounds of Nescafe, decaffeinated Nescafe, Cacsol, Nescasol, and powdered cheese sold by petitioner in the United States in any 1 year. (2) 9 percent of the net sales price of the next 2 million pounds of such products sold. (3) 8 percent of the net sales price of the next 2 million pounds of such products sold. (4) 7 percent of the net sales price of the *351 next 2 million pounds of such products sold. (5) 6 percent of the net sales price of all of such products sold in excess of 9 million pounds. The total royalties payable, however, were limited to one-third of the net profits derived from the sale of the products covered by the agreement. The agreement was to be effective for a period commencing on January 1, 1942, and to end with respect to each of the products covered on the date of the expiration of any United States letters patent issued with respect to such product, or if no letters patent were issued, the agreement was to end on December 31, 1955. The agreement of September 4, 1942, also recited that Inredeco had been - successful in making available to N.M.P. [petitioner] three additional percolator sets which Inredeco arranged to import from an associated company in Switzerland, which percolator sets were urgently needed by N.M.P. in order to increase its production facilities for Nescafe, especially since similar percolator sets could not be obtained in the United States because of priority restrictions; *352 * * * WHEREAS such three additional percolator sets were originally intended for installation in plants of affiliated companies of Inredeco in Chile, Cuba and Mexico which were under technical supervision by Inredeco, and it was understood that such percolator sets would be released to N.M.P. in consideration of a revision of the royalty arrangements between Inredeco and N.M.P.; * * * Petitioner received three percolator sets from Switzerland in 1941 and 1942 which it installed at its plant in Sunbury, Ohio. Petitioner did not manufacture Cacsol or Nescasol on a commercial basis during the period 1942 to 1952, inclusive, and it did not make use of the process licensed to it under the agreement for the manufacture of powdered cheese during such period. Petitioner commenced construction of a coffee decaffeination plant in 1952 and began manufacturing and selling decaffeinated instant soluble coffee under the trade name "Decaf" in 1953. In the years following 1942, sales of Nescafe continued to expand rapidly and petitioner's production facilities were strained to meet the demand for the product. In 1944, petitioner purchased an abandoned brewery plant in Granite City, Illinois, and obtained *353 certificates of necessity from the United States Government for the additional facilities which were installed in that plant during 1944. Commencing in the latter part of 1942 and during World War II, substintial sales of Nescafe were made to the United States Government for the armed services, and during a part of the year 1944, all of petitioner's production of Nescafe was shipped to the armed services. During the period from 1938 to 1952, inclusive, petitioner did not conduct or carry on any basic research and development with respect to soluble coffee. Under the provisions of the royalty agreements and amendments thereto, it relied on Inredeco and the worldwide Nestle organization to conduct experiments and research and to furnish it with the results of that work. From 1941 until 1945, Durrenmatt, of Inredeco, under the direction of Gustav Huguenin, of Unilac, conducted experimental and development work at petitioner's quality control laboratory at Marysville, Ohio, and also worked in conjunction with other engineers and technicians employed by Inredeco on further developments of the Nescafe process. During all of such period, the salaries of Durrenmatt and all laboratory personnel *354 who assisted him at the Marysville laboratory were paid by Inredeco. The research work carried on by Inredeco included experimentations with new types of extracting methods, with methods of concentrating the extract prior to spray drying without loss of aroma, with respect to the discovery of better types of carbohydrates which would not give off any side flavors, with respect to the development of a pure instant soluble coffee without carbohydrates added, with the hydrolysis of coffee grounds, with the decaffeination of coffee without the use of solvents, and with the development of better spray-drying equipment, including air heaters. Most of this work was carried out by Durrenmatt and other employees of Inredeco or individuals whose salaries were paid by Inredeco while they worked on these projects at petitioner's Marysville laboratory. All of the developments resulting from the foregoing research work were given to petitioner who made use of such developments and who received technical assistance and advice from Inredeco with respect to the use of such developments. Inredeco also assisted petitioner in the planning and construction of additional factories which were opened in 1948. *355 The Egron Drler had been developed by Max Friedrich Gruber, of Inredeco, and patented on July 11, 1944 (United States patent No. 2,353,459). It was the "New Spray Drier" referred to in and made available to petitioner under the provisions of the 1942 agreement. The first of those driers was installed in petitioner's Sunbury plant in 1947. The Egron drier had greater capacity and higher thermal efficiency than the Merrell-Soule driers which petitioner had previously used. Egron driers were subsequently installed at petitioner's other Nescafe plants. The Egron driers were also equipped with a new type of powder separator, developed by Afico engineers. This separator was much more efficient in recovering the Nescafe powder in the drying chamber of the drier and resulted in considerable cost savings because it cut down powder losses which had been as high as 17 percent. During the years 1947 through 1952, important research and development work from which petitioner benefited was also carried on by Afico in Switzerland. A process for making Nescafe without the addition of carbohydrates, including the l.d.p., or low density powder, process, was developed by Afico and made available to petitioner. *356 That development enabled petitioner to produce a pure instant coffee (without added carbohydrates) and in such a way that half of the amount of coffee solids would fill the same size jar as had been used when an equal amount of carbohydrates had been added to the coffee solids. Experimental work on the low density powder process was completed by Afico in the spring of 1952, but it was not until the spring of 1953 that petitioner was able to use the process satisfactorily. During that year, one of petitioner's engineers was sent to Switzerland to learn the process and several of Afico's engineers visited the United States to assist petitioner in perfecting the use of the process on an industrial basis. An Afico engineer also played a substantial part in the design and construction of a coffee decaffeination plant for petitioner in the years 1951-1953. Employees of petitioner were also sent to Europe and trained by Afico in connection with this undertaking. The Swiss Nestle organization had been selling decaffeinated soluble coffee in Europe since 1942. Petitioner did not undertake the manufacture and sale of decaffeinated coffee in 1942, when it acquired the exclusive license for it *357 in the United States, or very soon thereafter because of the big demand for Nescafe. Petitioner's management believed that it should expand and develop the market for Nescafe before it undertook the manufacture of a decaffeinated coffee product. In 1945, the demand for Nescafe in the United States consumer market was tremendous, and it was impossible for petitioner to supply the market. In 1948, petitioner completed two new Nescafe plants, one at Freehold, New Jersey, and another at Ripon, California. The phenomenal success of Nescafe in the instant coffee market inevitably invited competition. In 1945, General Foods commenced making instant Maxwell House; Standard Brands began making instant Chase & Sanborn; and the Borden Company put out an instant coffee. When they first appeared on the market both instant Maxwell House and instant Chase & Sanborn were made with carbohydrates added. By 1952, 15 or 20 additional manufacturers had entered the market and manufactured a great number of different brand names of instant soluble coffee. Some of these manufacturers attempted to produce instant coffee products with processes which the Nestle organization believed were similar to some of *358 the claims of the Morgenthaler patent. As a result petitioner's licensor, Inredeco, Inc. (Panama), successfully maintained an action against one of the infringers and also instituted suit against Standard Brands. At the trial of the latter cause, Inredeco specified that only claims 6, 9, 10, and 11 of said patent were allegedly infringed by Standard Brands and conceded that all other claims under said patent were not infringed by Standard Brands. Claims 6, 9, 10, and 11 of United States patent No. 2,324.526 were those which described the Morgenthaler process without reference to the use of critically higher temperatures ranging from 160 degrees centigrade to 175 degrees centigrade, to the cooling of the extract below 15 degrees centigrade, and to defatting. Those processes employed by petitioner in the manufacture of Nescafe are covered by claims 1-5 which were not involved in the litigation. The action was tried before a jury in February 1949. At the conclusion of the trial, the jury was instructed to find for the defendant if the claims in issue were invalid, if there had been no infringement, or if the claims were both valid and noninfringed. The jury found for the defendant and *359 judgment was entered in accordance therewith. The judgment was not appealed. Except for the above-mentioned litigation, neither petitioner nor any other member of the Nestle organization has ever instituted an infringement suit against any person, corporate or otherwise, with respect to the manufacture and/or sale of soluble coffee in the United States. [3] No person, corporate or otherwise, not connected with the Nestle organization, has ever paid royalties to any member of the Nestle organization with respect to the manufacture and/or sale of soluble coffee in the United States. Petitioner and other manufacturers of instant soluble coffee, during the years material to this case, continuously conducted tests to determine consumer preferences for the various instant coffees on the market. Petitioner's tests indicated a preference for Nescafe over Borden at all times. Prior to 1949 its tests indicated a preference for Nescafe with carbohydrates added over Maxwell House with carbohydrates added. Premarketing *360 consumer tests made by Standard Brands in 1949-1950 with respect to its Chase & Sanborn pure instant coffee showed a slight edge organoleptically for Nescafe over its new product. Its tests showed a preference for Chase & Sanborn with respect to handling qualities. Tests made by General Foods, which made Maxwell House, showed that Nescafe with carbohydrates added was preferred to its soluble coffee until 1950 when it came out with Maxwell House pure [4] instant soluble coffee. Its tests in 1950 showed its pure soluble had first preference among consumers. During the years material to this case General Foods (as did many of petitioner's competitors) had its own research and development program for new products. It was engaged in the research and development of a soluble coffee product prior to 1943. Set forth below is a schedule showing for the years 1946-1956 the total sales of roasted coffee in United States retail food stores, and of such total, the amount sold as ground roasted coffee and the amount sold as *361 instant soluble coffee, and the percent of soluble sales to total sales. The schedule also shows the amount of Nescafe sold in the United States retail food stores during such years and the percent of the total soluble coffee sales which Nescafe represented. % of soluble
Sales of
coffee sales
% of Nescafe
Total
regular
Sales * of
to total
sales to
roasted
ground
soluble
roasted
Sales * of
total soluble
Year
coffee sales
coffee
coffee
coffee sales
Nescafe
coffee sales
1946
1,375,542
1,305,731
69,811
5.08
37,901
54.29
1947
1,358,965
1,275,714
83,251
6.13
43,507
52.26
1948
1,389,975
1,296,778
93,197
6.70
49,459
53.07
1949
1,493,535
1,392,274
101,261
6.78
52,915
52.26
1950
1,384,161
1,259,783
124,378
8.99
61,901
49.77
1951
1,388,343
1,231,633
156,710
11.29
65,549
41.83
1952
1,486,783
1,272,357
214,426
14.42
65,971
30.77
1953
1,597,922
1,305,084
292,838
18.33
75,265
25.70
1954
1,599,302
1,184,544
414,758
25.93
93,235
22.48
1955
1,717,297
1,216,830
500,467
29.14
109,709
21.92
1956
1,872,805
1,259,480
613,325
32.75
114,125
18.61
Set forth below for the years 1939 to 1952, inclusive, are petitioner's sales of Nescafe in pounds and dollars, *362 the net profit (before taxes) realized thereon before the deduction of royalties, the royalties accrued and deducted, and the net profits (before taxes) realized on such sales after the deduction of royalties. Net profit
Sales
(before
deduction of
Year
Pounds
Dollars
royalties)
1939
39,588
$ 43,508.00
($8,779.00)
1940
506,340
552,483.00
(97,032.00)
1941
2,304,756
2,339,139.98
615,054.67
1942
4,705,106
4,224,497.26
1,116,456.00
1943
5,643,290
4,042,716.40
1,286,903.36
1944
8,055,998
6,221,811.93
1,460,664.03
1945
9,641,581
8,518,796.64
2,421,876.00
1946
11,263,750
12,077,267.30
3,732,529.81
1947
13,449,111
16,822,370.14
4,161,486.88
1948
14,892,753
19,710,587.42
4,337,049.51
1949
18,853,017
25,282,137.71
7,615,515.19
1950
18,134,465
30,610,138.78
4,974,457.27
1951
23,428,504
42,844,858.84
8,042,593.21
1952 *
23,130,216
43,929,452.69
4,984,903.64
Total
154,048,475
$217,219,766.09
$44,643,678.57
Net profit
Royalties
(after
accrued and
deduction of
Year
deducted
royalties)
1939
1940
1941
$ 116,956.90
$ 498,097.11
1942
372,152.10
744,303.90
1943
380,123.81
906,779.55
1944
486,888.01
973,776.02
1945
723,178.35
1,698,697.65
1946
971,274.87
2,761,254.94
1947
1,308,876.73
2,852,610.15
1948
1,445,683.17
2,891,366.34
1949
1,835,800.69
5,779,714.50
1950
1,658,152.39
3,316,304.88
1951
2,680,864.40
5,361,728.81
1952 *
1,661,634.55
3,323,269.09
Total
$13,641,585.97
$31,107,903.60
*363 Based upon the dollar sales and net profits after the deduction of royalties, as set forth above, petitioner's ratio of such net profits to sales of Nescafe for the years 1941 to 1952, inclusive, was as follows: Year
Ratio
1941
21.29
1942
17.62
1943
22.43
1944
15.65
1945
19.94
1946
22.86
1947
16.96
1948
14.70
1949
22.86
1950
10.83
1951
12.51
1952
7.57
The average rate of royalties paid, expressed as a percentage of total dollar sales for the period 1942 to 1952, inclusive, was 6.3 percent and for the period 1947 to 1952, inclusive, was 5.91 percent. Set forth below are the advertising expenses which petitioner incurred during the years 1939 to 1952, inclusive, in promoting Nescafe, and the additional "promotion" expenses of $3,275,850 which were incurred for that purpose in 1952: Year
Expenses
1939
$ 16,290
1940
284,294
1941
377,946
1942
212,921
1943
99,226
1944
301,330
1945
612,668
1946
1,029,286
1947
2,168,392
1948
2,216,321
1949
1,468,970
1950
1,924,982
1951
3,121,564
1952
6,572,459 The following schedule shows petitioner's total sales and net profits after deduction of *364 royalties and advertising and promotion expenses but before taxes for the years 1936 to 1952, inclusive: Net profit
Year
Net Sales
before taxes
1936
$ 15,666,607
$ 329,085
1937
17,022,981
71,315
1938
16,128,159
202,307
1939
14,664,858
390,795
1940
17,903,619
471,569
1941
28,092,685
1,907,577
1942
37,351,977
1,844,859
1943
34,121,208
1,732,446
1944
40,854,198
1,640,851
1945
44,813,819
2,220,744
1946
43,146,384
3,649,642
1947
50,441,571
3,525,051
1948
58,068,859
2,586,744
1949
68,901,630
5,058,831
1950
75,577,228
3,149,538
1951
70,415,466
5,277,736
1952
110,895,336
2,376,203
Set forth below is a schedule showing petitioner's net worth at the beginning of each of the years 1937 to 1952, inclusive: Year
Net worth
1937
$ 3,625,466.10
1938
4,054,193.75
1939
3,922,070.81
1940
4,258,431.88
1941
3,854,432.72
1942
4,870,976.31
1943
6,763,379.25
1944
5,586,643.18
1945
6,040,222.37
1946
7,124,661.24
1947
9,243,186.24
1948
10,775,654.77
1949
14,552,047.86
1950
17,769,111.94
1951
21,024,863.73
1952
23,409,060.37 From 1936 to 1952, inclusive, petitioner's investment in plant (including buildings, machinery, etc.) increased from $5,310,720.99 to $29,321,148.59. Late in December 1951, and effective as of January 1, 1952, Unilac transferred to Afico, as nominee of Alimentana, Unilac's *365 reversionary rights to the United States trademark "Nescafe" and all right, title, and interest of Unilac in and to the process for the manufacture of soluble coffee, including all patents with respect thereto; and it likewise caused Inredeco to transfer to Afico, as nominee of Alimentana, all of its right, title, and interest in the agreement of January 1, 1942, between Inredeco and petitioner. Afico undertook the obligations of Inredeco under the agreement. Petitioner paid the royalties due under the agreement for the year 1952 to Alimentana. Lamont, Corliss & Co. (hereinafter referred to as Lamont) was a corporation organized under the laws of the State of New York on December 20, 1901. Its principal office was in New York City. Lamont owned all of the outstanding stock of Peter Cailler Kohler Swiss Chocolates Co., Inc. (hereinafter referred to as PCK), a New York corporation organized in 1909. Prior to December 1949, Unilac owned 36.96 percent of the outstanding capital stock of Lamont. Individuals unrelated to Unilac owned the remaining 63.04 percent of such stock. In December 1949 Unilac acquired that 63.04-percent stock interest and Lamont thereupon became a wholly owned subsidiary *366 of Unilac. On December 29, 1950, Lamont's name was changed to Nestle Chocolate Company, Inc. (hereinafter referred to as Chocolate). PCK was merged into Chocolate on October 1, 1951. On March 20, 1952, petitioner acquired from Unilac all of the issued and outstanding capital stock of Chocolate for $11,720,696.45. On April 1, 1952, Chocolate was merged into petitioner. PCK was the manufacturing subsidiary of Lamont and maintained its factory at Fulton, New York. PCK manufactured a variety of chocolate and cocoa products, such as chocolate bars, bulk coatings, and bulk cocoas. Lamont distributed and sold the products manufactured by PCK. Prior to October 1948, PCK had developed a cocoa-sugar powder which was miscible with cold milk and was used for the purpose of making a chocolate drink. The characteristics desired by PCK for this product were flowability, which means that the mixture would flow easily in and out of a container and not lump: wettability, which means that when a spoonful of the mixture was placed on top of a glass of cold milk it would disappear very quickly just as would granulated sugar; miscibility, which means that once the mixture is in the glass of milk it would *367 make a uniform solution within the glass; and dispersibility, which means that it would have few so-called sinkers or cinders which settle at the bottom of the glass. In October 1948, Lamont put the above-described cocoa-sugar mixture on the market under the trade name "Quik." At that time, there was no similar product being marketed in the United States, and there was therefore what may be described as a vacuum market. Other mixtures of cocoa and sugar were being sold but none had the qualities of being wettable, miscible, and dispersible in cold milk. At the time Quik was introduced, Lamont manufactured about 50,000 pounds a month. When Quik was placed on the market in October 1948, it met with only limited success. The principal difficulty with the product was that it had poor shelf life, which means that after being exposed to differing degrees of temperature and humidity over a period of time, it did not have the same qualities or characteristics which it had when first manufactured. Efforts were made in PCK's Fulton plant laboratory to correct those difficulties in order to produce a more satisfactory product, but these efforts were not successful. In January 1949 the National *368 Suger Refining Company approached Lamont and commenced discussions concerning Lamont's possible use of a process for the manufacture of a miscible cocoa-sugar powder which had been developed by Louis Lang, of National. National offered the product to Lamont and tests were made of the Lang process. Such tests showed that the Lang process produced a product which was less satisfactory than Quik as it was being made in 1949. Discussions between National and Lamont continued throughout most of 1949 but the Lang process was not adopted because of the foregoing difficulties. Although Quik, as it was manufactured in 1949 was a far from satisfactory product, Lamont continued to sell it because it did have promise and Lamont was anxious to stay in this new, undeveloped vacuum market. For that reason, production continued throughout 1949, was temporarily stopped in December of that year, but was resumed for 3 months in March, April, and May, 1950. In December 1949, Afico disclosed to Lamont that it had perfected a process for the commercial manufacture of a cocoa-sugar powder which had the characteristics which Lamont desired for Quik; that is, it was flowable, wettable, and readily miscible *369 and dispersible in cold milk. Early in 1950 the Afico process was tested by PCK at the Fulton plant. Such tests showed that a product made with the Afico process had the qualities and characteristics which Lamont wanted for Quik. Among other desirable features, the Afico process decreased the density of the powdered product which greatly improved its flowability, wettability, and miscibility, and also improved the shelf life. As a result of the tests, Lamont decided to adopt the Afico process. On July 1, 1950, Lamont and Afico entered into an agreement whereby Afico licensed Lamont to use the process for manufacturing Quik in the United States and any improvements and new methods related thereto which might be developed by Afico. Afico also agreed to provide technical assistance to Lamont in using the process. The use of the process was restricted to Lamont and PCK and could not be assigned. Lamont agreed to keep the process secret and to pay Afico a royalty of 5 percent of the net sales price for all products sold by Lamont which were manufactured under the process. The agreement was effective as of July 1, 1950, and continued until December 31, 1960, and thereafter subject to 60 *370 days' termination notice prior to year end. Lamont began using the Afico process commercially in July 1950, at which time some production difficulties were encountered. In an effort to solve these problems, Afico sent several of its experts to the Fulton plant where one of them remained as technical director for about 4 years, the latter's salary being paid by Lamont. With the assistance of these experts, Lamont was successful in solving many of the production difficulties encountered in employing the secret process for making Quik. During the period from 1948, when Quik was first introduced, through the year 1956, no product comparable to Quik was sold on the market. In 1956 a somewhat similar product was introduced by General Foods. Set forth below for the period 1949 to 1956, inclusive, are the sales of Quik in pounds and dollars, the advertising and promotion costs incurred in making such sales the net profits before the payment of royalties, and the royalties paid to Afico: Advertising
Net profit
and
(before
Year
Pounds
Sales
promotion
royalties)
Royalties paid
1949
931,542
$ 225,575
$ 99,267
($98,880)
1950
2,315,452
608,023
208,773
(92,763)
$ 23,878
1951
7,341,804
2,047,402
285,138
5,704
102,574
1/1-3/31/52
13,011,768 * *371 923,642
317,433 *
2,473
46,182
4/1-12/31/52
2,747,056
158,135
137,352
1953
18,132,864
5,806,505
291,297
693,179
258,925
1954
21,511,740
7,854,990
470,134
1,516,937
371,667
1955
29,567,211
11,286,099
978,271
1,472,818
563,724
1956
38,207,515
14,200,771
1,306,151
2,271,368
710,039
"Pelargon" is an acidified baby food milk product used for feeding babies and adults who have a delicate digestive system. Pelargon was developed in Switzerland by Afico and was manufactured under a secret formula. On July 5, 1943, petitioner entered into an agreement with Inredeco (Panama) under which petitioner secured the exclusive right to manufacture Pelargon in the United States. Inredeco agreed to give petitioner technical assistance and advice with respect to the manufacture of the product and to give petitioner the benefit of all future improvements and developments with respect to the product and process. Petitioner agreed to keep the formula secret and to pay Inredeco a royalty of 10 percent of the net sales price of the Pelargon manufactured and sold by it. The agreement was to continue in force from July 1, 1943, to June 30, 1944, and thereafter subject to discontinuance upon 3 months' notice by either party. Petitioner manufactured and sold Pelargon from 1944 through 1949. It was not a financially successful venture and petitioner lost money on Pelargon. During this period petitioner paid royalties totaling *372 $39,142.68 to Unilac. The royalties paid for the years 1944 and 1945 were deducted by petitioner on its income tax returns and such deductions were allowed in the final audit of such returns by the Internal Revenue Service. Such royalties were received and were reported by Unilac as ordinary income on its tax returns for those years. Petitioner disputed the payment of royalties for the years 1946 through 1949 and royalties for those years in the total amount of $13,802.39 were not paid to Unilac until 1950, at which time the parties entered into an agreement that subsequent royalties would be limited to one-third of the net profits realized from the manufacture and sale of Pelargon by petitioner. Petitioner deducted the royalties for the years 1946-1949 in the amount of $13,802.39 paid to Unilac in 1950 on its income tax return for the year 1950. Respondent disallowed the deduction and claimed it was a distribution of profits. On its Federal income and excess profits tax returns for the years 1941 to 1952, inclusive, petitioner deducted the royalties paid on soluble coffee sales and on Quik during such years as a business expense. Petitioner's tax returns for the years 1941 ot 1946, *373 inclusive, were audited by revenue agents, and such years were closed without any adjustment of the amounts claimed therein as deductions for royalties except for adjustments resulting from renegotiation of Government contracts relating to the taxable years 1943 and 1944. Petitioner's tax returns for the years 1947 to 1952, inclusive were audited by respondent's agents and petitioner received a revenue agent's report dated May 14, 1956. In such report the aforementioned royalty payments made during the years 1947 to 1952, inclusive, were disallowed as deductions, and respondent claimed that such payments were distributions of profits. On its Federal income and excess profits tax returns for the years 1941 to 1951, inclusive, Unilac reported the royalty payments received from petitioner for such years as royalty income in the amounts as set forth above, except that $45,481.64 of the royalty payable for the year 1944 was received by Unilac in 1953 and reported on its return for that year. In the final audit of Unilac's tax returns for such years the royalty payments received from petitioner on sales of Nescafe were included as fully taxable ordinary income, and Unilac paid the Federal *374 income taxes thereon. For the years 1947 to 1949, inclusive, Unilac filed no claims for refund of any Federal income taxes paid for such years. The time within which such claims could have been filed for such years expired prior to the audit of petitioner's returns in which the deduction of such royalty payments was disallowed. In 1941, and 1947, petitioner paid cash dividends to Unilac in the respective amounts of $375,000 and $750,000. Unilac reported the receipt of such cash dividends from petitioner on its Federal income and excess profits tax returns for such years and claimed the dividends-received credit of 85 percent of such amounts as provided by section 26(b), I.R.C. 1939, and reported the balances as fully taxable ordinary income. In the final audit of Unilac's returns for such years, no adjustment was made by respondent in the amounts claimed as dividends received credits. The royalty payments made by petitioner on Nescafe, Quik, and Pelargon during the years 1947 to 1952, inclusive, were for the use of patents, processes, technical knowhow, and continuing research and development relating thereto, having value to the petitioner, under bona fide licensing agreements, and *375 were reasonable in amount. Opinion The issue for decision is whether the amounts paid by petitioner to its parent corporation or other corporate members of its parent organization during the years 1947-1952 as royalties for the use of patented on secret processes for making "Nescafe," "Quik," and "Pelargon" were deductible by petitioner as royalties paid, or were nondeductible distributions of profit as determined by respondent. The payments were made under agreements and circumstances described in detail in our Findings of Fact. The main thrust of respondent's argument in support of his determination is that the agreements, being between related parties, were not binding agreements but were mere artifices designed solely for tax avoidance purposes, and that the amounts paid were not reasonable. It is well established that royalties paid by a corporation to its controlling stockholders for use of a patent or process owned by the stockholders are deductible by the corporation as a business expense, provided the amount paid is reasonable, considering the value of the invention or process and its [*] in the open market. O.D. 440, 2 T.C. 215 (1920); Stearns Magnetic Mfg. Co. v. Commissioner, 208 F.2d 849(C.A. *376 7. 1954); Ingle Coal Corporation v. United States, 131 Ct. Cl. 121, 127 F. Supp. 573 (1955). It is also recognized that an agreement between a corporation and its controlling stockholders is valid and enforceable if the arrangement is fair and reasonable, judged by the standards of a transaction entered into by parties dealing at arm's length. Stearns Magnetic Mfg. Co. v. Commissioner, supra; Differential Steel Car Co, 16 T.C. 413 (1951); Heatbath Corporation, 14 T.C. 332 (1950); Wall Products, Inc., 11 T.C. 51 (1948); Webb Press Co., Ltd., 3 B.T.A. 247 (1925). The fact that petitioner was dealing with its own parent does not of itself condemn the transactions and agreements here involved as shams. On the other hand, the fact that the transactions were between a parent and its subsidiary invites close scrutiny, Differential Steel Car Co., supra; and in such cases both the bona fides of the arrangements and the reasonableness of the amounts required to be paid must be considered in determining whether the payments were in fact royalties or simply disguised distributions of corporate profits to the parent-stockholder. Gronberg Equipment, Inc., 11 T.C. 704 (1948); W. N. Thornburgh Manufacturing Co., 17 B.T.A. 29 (1929). *377 The reasonableness of the amounts paid in relation to the value of the benefits received is a factor to be considered in determining both the bona fides of the arrangements, Albert E. Crabtree, 22 T.C. 61 (1954), affirmed per curiam 221 F. 2d 807 (C.A. 2, 1955), and the true character of the payment, Jos. N. Neel Co., 22 T.C. 1083 (1954). Cf. Stanley Imerman, 7 T.C. 1030 (1946). We are convinced by the preponderance of the evidence that all the agreements and royalty arrangements here involved were bona fide and binding contracts unless modified or rescinded by agreement of the parties. We think that in each instance the parent organization had something of value to give to petitioner and that an unrelated party would have been required to pay a royalty for using the patented or secret processes involved. Without discussing in detail all the reasons for this conclusion, we think it is clear that with respect to Nescafe the parent organization developed a process, whether employing different combinations of known processes or combinations of known and new processes, which produced a soluble instant coffee acceptable to the consuming public, the use of which permitted petitioner *378 to add a new and valuable product to its business and to enter this field well in advance of its principal competitors. With respect to Quik, although petitioner's predecessor had been marketing Quik prior to the use of the process developed by the Nestle organization, it had not had much success with it, primarily because of its poor shelf life, until the use of the Nestle process made it possible to produce a cocoa-sugar powder that was flowable, wettable, and readily miscible and dispersible in cold milk, which retained these characteristics after it had been opened and allowed to remain on the shelf for awhile. Thereafter petitioner's sales of and profits from Quik increased rapidly and there seems to be little question that petitioner thus successfully marketed this product about 5 years ahead of its competitors. With respect to Pelargon, there is not too much evidence concerning the nature of the formula used to produce it, but what evidence there is reveals that petitioner did use a formula developed by its parent organization in manufacturing this product and it agreed to pay a royalty thereon as we believe anyone would have been required to do had it admittedly used the trade *379 name and formula. Respondent argues that evidence of the fact that the agreements were not negotiated at arm's length and are not bona fide is the fact that they did not contain all of the "boiler plate" provisions that would normally be written into any licensing agreement made by unrelated parties. In support of this argument respondent called as an expert witness an eminent patent attorney who testified that these agreements were so lacking in some of the provisions usually inserted in licensing agreements for the protection of the licensee that he did not think a licensee would be willing to pay a very high royalty under such agreements. First, it must be acknowledged that petitioner and its parent were not dealing at arm's length with each other in the sense that strangers would deal with each other. A parent and subsidiary would have little need for all the protective provisions strangers would insist on in dealing with each other. But that fact alone does not make their agreement any less bona fide or valid. The basic ingredients of licensing agreements were incorporated in the agreements here under consideration: (1) The patent or process being licensed was described, (2) the *380 licensor agreed to provide technical assistance, (3) the amount of the royalty was stated, and (4) the term of the license was specified. Furthermore, the parties acted under the terms of the agreements and complied therewith. Compare Roy C. Acuff, 35 T.C. 162 (1960), affirmed per curiam 296 F. 2d 725 (C.A. 6, 1961). The licensor supplied the licensee with the process, instructed the licensee on the use thereof, and supplied the licensee with technical assistance in meeting any problems that arose. In turn, the licensee paid the licensor the royalties provided for in the agreements. Respondent claims that licensing agreements are not usually entered into between a parent and its foreign subsidiaries. There can be no question here that petitioner was a separate entity from its parent. It had been operating as such long before the licenses here involved were granted. And we will not substitute our judgment for that of Alimentana's officers and directors, that there was a sound business reason, being the threat of war in Europe, to establish Unilac as an American subsidiary to hold the American patents and receive the royalties from the use of the patents and processes in America. Respondent's *381 principal attack on the bona fides of these agreements is that they were motivated primarily for tax avoidance purposes. He points out that the first Nescafe agreement was made in 1938 when the war clouds were gathering in Europe and that war inevitably brings higher taxes so that it was to the Nestle organization's tax advantage to require petitioner to pay Unilac deductible royalties rather than nondeductible dividends. Not only does this ignore the separate entities of the two corporations and the fact that one was providing something of great value to the other, but it also ignores the 85-percent dividend-received credit that Unilac might have claimed had the payments from petitioner to it been in the form of dividends. [5]
Respondent next claims that the only reasonable explanation of the 1941 and 1942 amendments of the Nescafe agreement was that simultaneously with both amendments, Congress enacted or was about to enact *382 substantial increases in the excess profits tax and that inasmuch as petitioner paid excess profits taxes and Unilac did not, it is obvious that the royalty rates were increased retroactively solely for tax avoidance purposes. Not only does the evidence fail to support this assumption, which necessarily would have required considerable clairvoyance on the part of the taxpayers, but the evidence indicates that respondent audited petitioner's returns for the years 1942 through 1946, when the excess profits tax was in effect, and did not disturb the royalty deductions claimed by petitioner. The same thing may be said of the Pelargon agreement, which was entered into in 1943. And finally, respondent argues that the fact that Alimentana directed that the Nescafe royalties be paid to itself, rather than Unilac, at a time when the American and Swiss Governments were considering a tax treaty which would eliminate any American tax on royalties paid to a Swiss corporation, makes it clear that all the royalty agreements were tax motivated. Just how this action in 1951 could have a bearing on the bona fides or reasonableness of the royalty agreements executed 10 years prior thereto, or could have *383 any bearing on whether petitioner may deduct the royalties paid in 1951 under those agreements, is hard to understand. We think it is settled that a taxpayer may arrange his affairs in any manner he chooses and such arrangement will be accorded recognition for tax purposes, even though it may result in reducing or avoiding tax, provided such arrangement has substance and actually results in a situation which the tax statute contemplates. Gregory v. Helvering, 293 U.S. 465 (1935). We have heretofore concluded that the licensing agreements here involved were bona fide and the payments provided for therein were for the use of property by petitioner to which it had not taken title, and were the type of payments contemplated by section 23(a)(1) of the 1939 Code. While tax savings may have been a consideration in making these agreements, we are satisfied it was not the prime objective in either making the royalty arrangements or fixing the amounts thereof. As previously stated, we think the concept of royalty arrangements between the percent organization and its American subsidiary was reasonable under the circumstances. Petitioner has given us its reasons for conducting its business in *384 this manner, which seem sound, and respondent has given us no basis to dispute them. Respondent claims there was no business reason or justification for amending the original agreement in 1941 and again in 1942. We think the evidence proves otherwise. It shows that through the combined efforts of petitioner's own employees and those of the parent organization petitioner was able to market Nescafe commercially and profitably at an earlier date than the 3-year experimental period anticipated in the original agreement of 1938. The original agreement provided for a royalty based on pounds of the product sold, which the licensor did not like because it would receive no benefit from inflated prices, and which the licensee was dissatisfied with because it was required to pay a royalty whether it made a profit or not. We think it only reasonable to assume that under such circumstances even unrelated parties would renegotiate the agreement to provide a royalty based on a percentage of sales of the product and limited to one-third of the net profit on the product, and also to reduce the royalty-free period from 3 years to 2 years to coincide with the actual experimental period. We have a little *385 more difficulty in accepting petitioner's justification for revising the agreement in 1942 increasing the royalty by a substantial amount. It is true the 1942 amendment granted a license to use several additional processes and a new spray drier developed and later patented by the parent organization, but absent a showing that the royalty provided for use of all the processes was less than fair and reasonable for those added, we do not see how this alone would justify doubling the royalty on the first 3 million pounds of Nescafe sold. Of course petitioner may have received some benefit from just being granted a license to use these additional processes and the new spray drier - but it could be argued that it was entitled to use some of these developments under the original agreement anyway. The 1942 agreement recites that a part of the consideration for the new agreement was that the parent had made available to petitioner three additional percolator sets made in Switzerland which petitioner could not otherwise obtain and which doubled petitioner's capacity. It is also apparent from the evidence that petitioner's success with this product had far exceeded the expectations of the parties *386 at the time the original agreement had been made, and that this was due in a large measure to the continued research and experin enting conducted by the parent organization and the technical assistance afforded petitioner by the parent which both increased the quality of the product and decreased the cost thereof. We suppose these circumstances would justify the licensor in demanding and the licensee in granting a larger share of the profits to the licensor in the form of increased royalties, particularly where the limitation to one-third of the net profits was retained. At least these parties thought so - and as long as the amount of the royalty paid was commensurate with the value of the benefits received and was reasonable we would not be inclined to, nor do we think we would be justified to, conclude that the increased royalty was something other than what it purported to be. Respondent's argument that the fact that the agreements extended over the life of the patents or 14 years, rather than a shorter term, is evidence that they were not bona fide seems without merit. The ordinary rule is that the term of a license is coextensive with that of the patent or patents licensed, which *387 were the terms of the agreements here. Cold Metal Process Co. v. United Engineering & F. Co., 107 F. 2d 27 (C.A. 3, 1939); Ellis, Patent Licenses, sec. 282 (Deller's 3d ed. 1958). This leaves only the question whether the amounts of the royalties paid were reasonable, which the parties recognize is the major factor in deciding this issue. A number of the arguments we have discussed above of course enter into the determination of reasonableness. We will make no effort to detail all the evidence or arguments of the parties on this point. Suffice it to say that we have considered them all in arriving at our conclusion of fact that the royalties here involved were reasonable. However, a few points on this question appear to warrant discussion. It is quite evident from the record that petitioner's use of its parent's patents and processes for making Nescafe and Quik were of great value to petitioner. Petitioner developed from a corporation having net sales of about $16 million and a net worth of about $4 million in 1938 to a corporation having net sales of almost $111 million and a net worth of about $23 1/2 million in 1952. Petitioner's net profit on Nescafe after deduction of royalties *388 for the period 1939 through 1952 totaled over $31 million, which appears to have represented the major part of petitioner's total net profit during that period. It paid royalties on Nescafe of about $13.6 million during the same period, so its retained profit on Nescafe during the period was more than twice the amount of royalties paid, despite the increase in royalties. The parent's processes and technical know-how and assistance enabled petitioner to enter both the instant soluble coffee market and the instant cocoa milk market a number of years in advance of its principal competitors. And the parent's continuing research permitted petitioner to switch from instant coffee with carbohydrates added to the pure instant coffee, and to decaffeinated coffee, when the market demanded it. Respondent argues that there was no need for petitioner to pay royalties because the various processes used under the parent's patents were known at the times petitioner was granted licenses, which is referred to by the parties as "prior art." First, the Nestle organization was able to obtain an American patent on the process licensed to petitioner and this establishes at least a presumption that the entire *389 combination of materials, processes, and equipment used in making Nescafe was not previously known or used. The Board of Tax Appeals held in Joseph H. Adams, 23 B.T.A. 71 (1931), affd. 65 F. 2d 262 (C.A. 5, 1933), certiorari denied 290 U.S. 660 (1933), that it must accept patents issued by the patent office as valid and properly issued and would not countenance a collateral attack on the action of the patent office in a tax proceeding. Secondly, even if the processes had not been patented, petitioner did not know the processes until its parent organization made them available to it and it was the use of these processes and the parent's technical know-how and assistance which put petitioner in a position to make a profit on these products which were new to it. As stated in Hartford National Bank & Trust Co. v. E. F. Drew & Co., 133 F. Supp. 648 (D. Del. 1955): "Quick commercial success of a new process 'looms [large] in the evaluation of the inventive thing.'" Petitioner produced expert witnesses who testified that in their opinion the royalties paid by petitioner under the 1942 Nescafe agreement, under the Quik agreement, and under the Pelargon agreement, were fair and reasonable *390 and in line with royalties paid on other secret or patented processes used in the same or similar fields. Respondent's expert witnesses, except the patent attorney previously mentioned, testified primarily with respect to the prior art involved in the Nescafe process. The patent attorney testified only that he did not think an unrelated licensee would pay a royalty as high as that paid by petitioner under agreements as loosely drawn as these. We think the preponderance of the evidence shows that the royalties paid by petitioner were reasonable when judged by standards of a transaction entered into by parties dealing at arm's length. Finally, respondent claims that prior to 1947 petitioner had paid its parent more than the value of the benefits received by petitioner, and that by that time others had successfully entered the instant coffee field and were taking a good portion of the business, so that petitioner should have repudiated the license agreements and entered the field on its own, particularly after the parent was unsuccessful in its infringement suit against Chase & Sanborn in 1949. First, the result of the Chase & Sanborn infringement suit did not necessarily mean that the *391 Nescafe patent was invalid, particularly with respect to the high-temperature process which petitioner was using, which was not involved in the suit. See De Sollar v. Hanscome, 158 U.S. 216, 222 (1895); Willcox & Gibbs Sewing Mach. Co. v. Sherborne, 123 F. 875 (C.A. 3, 1903). Next, while it is true that petitioner's competitors had instant coffee on the market by 1947 and were getting some of the business, nonetheless, the evidence indicates that petitioner's sales and profits on Nescafe continued to increase and also that it was not until General Foods marketed its pure instant Maxwell House coffee in 1950 that the consumer preference tests indicated a preference for any instant coffee over petitioner's Nescafe Compare Warner-Lambert Pharm. Co. v. John J. Reynolds, Inc.178 F. Supp. 655 (S.D. N. Y. 1959), affirmed per curiam 280 F. 2d 197 (C.A. 2, 1960). While there seems to be some question whether a licensee is estopped to deny the validity of a patent during the continuance of the license, as a defense to an action for royalties, there seems to be little doubt that the licensee must first repudiate the agreement before he can deny the validity of the patent while continuing *392 to use the patented process. See Ellis, Patent Licenses, ch. XXVI (Deller's 3d ed. 1958); Automatic Radio Co. v. Hazeltine, 339 U.S. 827, 836 (1950); St. Paul Plow Works v. Starling, 140 U.S. 184 (1891). We do not think it reasonable to assume that any licensee in petitioner's position would have felt compelled to repudiate these agreements, thereby risking loss of use of the Nestle name and the many other benefits petitioner derived and continued to derive under the agreements in order to escape payments of these royalties, particularly if the royalties paid were reasonable in amount for the benefits received. It seems to us this would be a matter of business judgment. We hold for petitioner on this issue. Because of concessions made by petitioner on other issues. Decisions will be entered under Rule 50. Footnotes
1. Carbohydrates equal in amount to the coffee solids were added both to seal in the aroma and to increase the volume so that one spoonful of the product would make one cup of coffee.↩
2. The original agreement and the amendment thereto had included Canada, but the agreement of 1942 mentioned only the United States.↩
3. This was stipulated. However one of the patent applications received in evidence does mention infringement suits against two other corporations which were discontinued by stipulation.↩
4. Pure instant coffee is a soluble coffee extract without carbohydrates added. The necessary volume (for measurement purposes) is obtained by "puffing up" the pure coffee extract.↩
*. Expressed in terms of equivalent of pounds of ground roasted coffee; i.e., 1 lb. of instant soluble coffee is equal to 3.2 lbs. of ground roasted coffee.↩
*. Includes, in addition to sales of Nescafe, sales of Nestle's Instant Coffee, first marketed in 1952, in the following amounts: ↩
Sales
Pounds
Dollars
716,802
$2,732,405.37
*. Total annual figure, for 1952 (not broken down between the two periods).
5. Unilac reported the amounts received from petitioner as ordinary income. Petitioner was not notified of respondent's disallowance of the deduction for royalties until after the time for Unilac to file claims for refunds for the years 1947, 1948, 1949 had expired.↩