Thomas **WORCESTER** et al., Petitioners,

v.

**COMMISSIONER OF INTERNAL REVENUE**, Respondent.

No. 6715.

United States Court of Appeals
First Circuit.

Heard Oct. 3, 1966.

Decided Dec. 7, 1966.

---

John L. Saltonstall, Jr., Boston, Mass., with whom Gerald T. O'Hara, Joseph D. Steinfield and Hill & Barlow, Boston, Mass., were on brief, for petitioners.

Burton Berkley, Atty., Dept. of Justice, with whom Mitchell Rogovin, Asst. Atty. Gen., and Lee A. Jackson and David O. Walter, Attys., Dept. of Justice, were on brief, for respondent.

Before ALDRICH, Chief Judge, WOODBURY,* Senior Circuit Judge, and COFFIN, Circuit Judge.

## OPINION OF THE COURT.

ALDRICH, Chief Judge.

This is a series of consolidated petitions to review decisions of the Tax Court which determined deficiencies in the 1947 individual tax return of petitioner Thomas Worcester, and in the 1948–52 joint returns of Thomas Worcester and wife, and upheld the Commissioner's impositions of fraud penalties and interest. A number of sources of income were involved, all of which relate essentially to the husband, and the asserted fraud was wholly his.

The facts are these. Thomas Worcester, Inc. (TWI) was incorporated in Mas-

* By designation

sachusetts in 1946 to engage in the business of performing architectural and engineering services and construction work. During the years in question Worcester and his wife owned a majority of the voting stock. Worcester was the principal officer, and one Murphy was comptroller. Ross Turner & Company (RT) was a partnership, formed in 1949, of which Worcester and Murphy held themselves out as the active partners, and the income of which was divided equally between them on the partnership tax returns. Allegedly it was a sales agency. State Street Sales, Inc. (SSS) was a Massachusetts corporation formed in 1950, authorized to perform architectural, engineering and construction work, and to operate a restaurant. During 1950 Worcester acquired all of its stock.

Four categories of payments are involved, all, initially, from TWI: (1) Payments to Worcester allegedly for travel and entertainment expenses; (2) Payments to RT and SSS that were retained by them; (3) Payments made to RT and SSS which were subsequently turned over by them to Worcester; (4) Payments made to various individuals and allegedly passed on to Worcester. No accounting questions are involved,[1] but matters of more general substance.

■ (1) With respect to the expense allowances not reported in petitioners' returns as income, TWI had a general account for employee expenses, which may, or may not, have included Worcester. In addition, it made $100 weekly payments to Worcester, commencing in 1947, allegedly for travel and entertainment expenses, that were increased to $150 weekly in February 1949 and thereafter. The first nine weeks were in varying amounts, but averaged out to exactly $100. There were no written records or vouchers of any sort, and in oral testimony Worcester could describe only a relatively small amount of alleged actual expenses. While this is understandable, particularly in the days when taxpayers often kept few such records, we cannot say as matter of law that petitioners sustained their burden of showing the Commissioner's assessment erroneous. Welch v. Helvering, 1933, 290 U.S. 111, 54 S.Ct. 8, 78 L.Ed. 212. Indeed, such regular and sizeable expense allowances so consistently maintained, and so unpersuasively explained, would seem a possible badge of fraud.

■ (2) Some $100,000 was paid by TWI to SSS in the years following its formation, allegedly for services although it rendered none, which was retained by it.[2] Since Worcester was the controlling stockholder of both corporations, this was income to him. Biltmore Homes, Inc. v. Commissioner of Internal Revenue, 4 Cir., 1961, 288 F.2d 336, 340–341, cert. den. 368 U.S. 825, 82 S.Ct. 46, 7 L.Ed.2d 30; Helvering v. Gordon, 8 Cir., 1937, 87 F.2d 663. Cf. Commissioner of Internal Revenue v. Makransky, 3 Cir., 1963, 321 F.2d 598. Any other rule would permit a stockholder to convert income into capital gains by transferring funds from one business to another then selling the latter company at a profit; or, if that were not permitted, at least to escape the strictures placed on accumulation of income by sections 531–537 of the Internal Revenue Code, 26 U.S.C. §§ 531–537, and thereby postpone at will the realization of taxable income. In the case at bar SSS operated its restaurant at a substantial loss. It was able to use this loss to avoid paying a tax on most of the "income" received from TWI. No error appears in charging Worcester with this income.

(3) More substantial questions arise with respect to payments which TWI made to RT and SSS, again for services not performed, and which, in turn, were shown to have been paid over to Worcester. We need not trace the course which

1. In the preparation of this opinion we reviewed the Tax Court's arithmetic and were not always able to achieve the same results. Possibly the error was ours. In any event, petitioners make no claim on this score, and any differences are not great.

2. A small amount was also so paid to, and retained by, RT. This raises no separate question.

such funds thereafter allegedly followed in and out of Worcester's safe deposit box. Worcester's position is that they were not income to him because he was a mere "conduit" through whom, by way of Murphy and a deceased individual named Norton, payments were made to public officials to advance TWI's business interests. We are not unimpressed by some of the evidence which petitioners marshal to support this position. However, we cannot rule as matter of law that the evidence favorable to Worcester went further than the recognition which the Tax Court in fact afforded it. The burden was upon petitioners. Perhaps not surprisingly, even the testimony favorable to them was not always consistent and above criticism. Wherever the line may be at which the Tax Court is required to accept a taxpayer's evidence, it is not here. Having wet his feet by, at least impliedly, confessing to bribery, it was to Worcester's advantage to claim that everything he took was thus paid out. The court was not obliged to believe him, particularly where he had shown himself not to have been entirely honest with the government in other respects.

■ Petitioners seek to claim that the government is collaterally estopped from disputing Worcester's testimony that he paid out these receipts to or through Murphy and Norton. This claim is based upon the following circumstances. Before the tax case was initiated the government brought a criminal proceeding against Worcester, charging the filing of false joint income tax returns for the years 1950, 1951 and 1952 with the intent to evade taxes. The factual assertions made by Worcester in defense of that case are essentially the ones made here in this. Worcester was convicted on all counts. Thereafter, as a result of a deal proposed by the district court and accepted, discussed *infra* in another con-

nection, Worcester was sentenced to jail, but the execution of the sentence was suspended and he was placed on probation upon the condition that he should give "full, candid testimony" if requested by any proper investigative body. See United States v. Worcester, D.Mass. 1961, 190 F.Supp. 548, 552–553. Subsequently Worcester testified before a federal grand jury, continuing his position that he delivered the money to Norton, and that he had no inkling, with one exception, to whom it ultimately went. The United States Attorney took the position that Worcester knew more than this, and a lengthy hearing was held before the district court as to whether Worcester's probation should be revoked. The court refused to revoke, stating expressly that Worcester's testimony had been "candid, credible, complete." Petitioners now argue that the criminal conviction is no longer pertinent, and that it is res judicata against the government that Worcester was nothing but a conduit for all of the sums paid to him from RT and SSS.

Worcester assumes that the district court probation revocation findings went to the extent of endorsing the correctness of all of his prior testimony, even as to dollar amounts. We do not think so.[3] The revocation issue was in much broader focus. The court was not trying over again the issue of whether there had been any willful understatements in the returns, but was considering simply the overall truthfulness of Worcester's grand jury testimony.

■ However, even if we consider that the court had duly found, in terms, that it believed that Worcester had not retained a penny of what he received from RT and SSS, we note two things. In the first place, the burden was on the government in the probation proceedings to prove Worcester wrong. The decision

---

3. Our conclusion is buttressed by the fact that although slightly over $275,000 was paid into RT and SSS, more than $100,000 of this was retained by them, as is conceded by Worcester. Had the amount of Worcester's alleged bribe payments been litigated in the revocation proceedings, the undisputed facts would have shown a maximum of $175,000 allegedly paid out by Worcester, rather than $275,000 mentioned in the course of the opinion. See 190 F.Supp. at 572.

in Worcester's favor meant only that the government had failed to persuade the court to disbelieve him. In the case at bar, the burden was on Worcester to show error on the part of the Commissioner. The difference in burden of proof is important. See Developments in the Law— Res Judicata, 65 Harv.L.Rev. 820, 878 (1952). Cf. Helvering v. Mitchell, 1938, 303 U.S. 391, 397, 58 S.Ct. 630, 82 L.Ed. 917. But of perhaps even greater importance, a probation revocation proceeding under 18 U.S.C. § 3653 is an informal matter—however protracted this one may have been—not restricted by many of the ordinary rules of evidence. Burns v. United States, 1932, 287 U.S. 216, 53 S.Ct. 154, 77 L.Ed. 266; United States v. Register, 4 Cir., 1966, 360 F.2d 689, cert. den. 87 S.Ct. 37. It should not lead to a judgment binding in other, more judicial, that is to say, more formal proceedings, as we suspect Worcester would be the first to contend had this particular probation proceeding gone against him.

(4) No question can arise with regard to some relatively small payments which the government traced from TWI to employees of TWI, notably Murphy and one Bullock, and from them to Worcester. This was a straight question of fact, and the Tax Court's resolution was not plainly wrong.

We turn to the question which underlies the government's entire case, namely, the issue of fraud. The burden was upon the government to prove by clear and convincing evidence, Drieborg v. Commissioner of Internal Revenue, 6 Cir., 1955, 225 F.2d 216, that some portion of the undeclared income in each year was fraudulently omitted from the return.[4]

The Tax Court compartmentalized its fraud findings. For the years 1947 and 1948 it relied upon the purported expense reimbursements which, in effect, it found purposely false, and the payments under item (4) *supra*, to TWI employees who turned the proceeds over to Worcester. For 1949 it added the creation of the "sham partnership [RT] which issued invoices to the corporation for nonexistent engineering services." It disposed of petitioners' contention that RT was created as a bribe cover-up by disbelieving petitioners' version of the transactions involving RT and by citing Spies v. United States, 1943, 317 U.S. 492, 63 S.Ct. 364, 87 L.Ed. 418. There the Court stated at 499, 63 S.Ct. at 368 that "[i]f the tax-evasion motive plays *any part* in such conduct the offense may be made out even though the conduct may serve other purposes such as concealment of other crime." (Ital. suppl.) Petitioners are not even in the relatively favored position of requiring the Commissioner to show that tax evasion was a primary motive. Cf. Young Motor Co., Inc. v. Commissioner of Internal Revenue, 1 Cir., 1964, 339 F.2d 481.

When it came to the years 1950, 1951 and 1952, although the conduct which it found to show fraud in the prior years continued, the court made no finding of fraud therefrom. Instead, it relied solely upon collateral estoppel. The government argues that we need not follow this course, since the court could have found fraud on the evidence without calling upon this principle. However, it is not our province to support a decision by saying that findings could have been made when they were not. Helvering v. Rankin, 1935, 295 U.S. 123, 55 S.Ct. 732,

---

4. Most of the years required proof of fraud in order to avoid the statute of limitations, and all of the years required proof of fraud to sustain the Commissioner's imposition of penalties under Int.Rev. Code of 1939, § 293(b) (now 26 U.S.C. § 6653(b)). In this latter connection, as in the first, Lowy v. Commissioner of Internal Revenue, 2 Cir., 1961, 288 F.2d 517, cert. den. 368 U.S. 984, 82 S.Ct. 596, 7 L. Ed.2d 523, we note that if any part of the deficiency was due to fraud the 50% penalty applies to the entire deficiency, not just the part produced by the fraud. Mensik v. Commissioner of Internal Revenue, 7 Cir., 1964, 328 F.2d 147, cert den. 379 U.S. 827, 85 S.Ct. 55, 13 L.Ed.2d 37. Johnson v. United States, 1941, 39 F. Supp. 103, 108, 94 Ct.Cl. 345. See also Duffin v. Lucas, 6 Cir., 1932, 55 F.2d 786, 798 (Revenue Acts of 1918 and 1921).

79 L.Ed. 1343. Had the court drawn the factual conclusion, and then referred to the criminal conviction as alternative support, we, and possibly it, would have been spared considerable trouble, but it did not.

We cannot accept the Tax Court's ruling that Worcester's conviction for filing willfully false returns with an intent to avoid tax can form the basis for collateral estoppel in the present proceedings. Whatever may be the merits of this contention in the ordinary case, see Moore v. United States, 4 Cir., 1965, 360 F.2d 353, its use here presents special problems. In the criminal case the district court, in offering to suspend sentence and place Worcester on probation, stated that if he did not "welcome this offer [of probation, but preferred] * * * to run the risk of the 18 months sentence which I originally said I would impose, and to seek by appeal or otherwise a complete vindication * * *" he was free to do so. 190 F.Supp. at 553. We can only construe this to mean that if Worcester replied that he was not content to accept probation without appealing, but chose the alternative of appealing, he ran the risk that the sentence he would have to appeal from would be a jail sentence. That Worcester's counsel so understood is clear from his reply, which is part of the record, to the court's offer in which he states that Worcester "* * * agrees to be bound by the conditions contained therein, including the waiver of his right of appeal." The court did not respond that this was an erroneous understanding.

█ The court was without right to bargain thus with the defendant, or to put a price on an appeal. A defendant's exercise of a right of appeal must be free and unfettered. Just as it is unfair to handicap him because of his poverty, cf. Coppedge v. United States, 1962, 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed. 2d 21; Griffin v. People of the State of Illinois, 1956, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, it is unfair to use the great power given to the court to determine sentence to place a defendant in the dilemma of making an unfree choice. We can add little to Judge Weinfeld's observations in a comparable situation[5] in United States ex rel. Elksnis v. Gilligan, S.D.N.Y., 1966, 256 F.Supp. 244, at 254. It is no answer to say that the defendant need not accept the court's "offer." The vice is that vis-a-vis the court he is in an unequal position.

Were the rule otherwise, we can only too readily envisage the possibilities of abuse. A judge who fears he has committed reversible error during the trial, and does not like the thought of being reversed, informs the defendant that he is considering a substantial sentence, but that if the defendant will demonstrate his repentence, or his good citizenship, by waiving appeal, he will suspend it.

It may well be that in the present case the judge's principal concern was to obtain consent to the proposed condition of the probation that Worcester testify, if called upon to do so by a proper tribunal, regarding the matters involved in the case (which we in no way suggest was an improper condition, cf. Kaplan v. United States, 8 Cir., 1956, 234 F.2d 345), and that the waiver of appeal was added because he wanted to get on with it. However, it was added. Furthermore, we cannot try the mind of the judge, to assess whether his motives in offering the defendant a valuable consideration to waive appeal (and we can think of little more valuable than not going to jail) were good or bad. To use the power of sentencing to obtain an undertaking to which the court was not entitled was necessarily a misuse of that power.

The interference with Worcester's right of appeal in some degree tainted the finality of the criminal judgment. It is true that this was by no act of the government. Nonetheless, it would compound the impropriety of the decision that Worcester, as defendant, was re-

---

5. We cannot find any cases on this exact situation. From this void we draw no inference unfavorable to Worcester.

quired to make,[6] if the government could take affirmative advantage of it. The Commissioner must prove fraud without reliance on this judgment.

We will mention only briefly petitioners' contention that because of the varying position that embezzled funds have occupied, tax-wise, compare Commissioner of Internal Revenue v. Wilcox, 1946, 327 U.S. 404, 66 S.Ct. 546, 90 L.Ed. 752, with Rutkin v. United States, 1952, 343 U.S. 130, 72 S.Ct. 571, 96 L.Ed. 833, and James v. United States, 1961, 366 U.S. 213, 81 S.Ct. 1052, 6 L.Ed.2d 246, they justifiably failed to claim that the funds with which they have now been charged were not income because, to the extent received or retained, they were embezzled from Worcester's corporate employer. Petitioners ask that we relieve them from their understandable legal mistake,[7] and find embezzlement, asserting that the record is complete enough to permit us to do so. The short answer is that embezzlement, particularly by a stockholder, who may be lawfully receiving constructive dividends, Currier v. United States, 1 Cir., 1948, 166 F.2d 346; Regensburg v. Commissioner of Internal Revenue, 2 Cir., 1944, 144 F.2d 41, cert. den. 323 U.S. 783, 65 S.Ct. 272, 89 L.Ed. 625, is a highly factual matter. We must question whether all of the available evidence is present. Furthermore, as we have said in another connection, even if the evidence were all before us, it is not for us to make new findings of fact. Petitioners raise this issue too late in every sense.

As to the claim by petitioners for certain tax credits, it is clear that the Tax Court is without power to grant such relief, Taylor v. Commissioner of Internal Revenue, 2 Cir., 1958, 258 F.2d 89,

and that a suit for refund under 26 U.S.C. §§ 1311–1315 is the proper way to seek such redress, if it is available.

With respect to the years 1947, 1948 and 1949 we find no error, and the orders of the Tax Court must be affirmed. With respect to the years 1950, 1951 and 1952, the orders must be vacated for lack of adequate fraud findings. We leave to the Tax Court's discretion what further proceedings, consistent with this opinion, and the scope thereof, it chooses to engage in.

---

6. Actually, the choice which Worcester exercised has proved to be not even the choice that he realized. In 1961, when he elected not to appeal, the Tax Court's view was that a conviction for filing a false return with intent to evade tax did not form the basis for collateral estoppel. Meyer J. Safra, 1958, 30 T.C. 1026; Eugene Vassallo, 1955, 23 T.C. 656. It changed its position in 1964. John W.

Amos, 43 T.C. 50, aff'd, 4 Cir., 1965, 360 F.2d 358.

7. It is questionable, at best, whether petitioners can so characterize their failure to rely on this defense, assuming, which we in no way intimate, it could have been valid. The latest of the cited cases was decided three years prior to the trial in the Tax Court.