· *Decision will be entered under Rule 50.*

THE R. T. FRENCH COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 5026–70—5028–70. Filed September 6, 1973.

*Frederic D. H. Gilbert*, *Robert B. Ross*, and *Donald G. Koch*, for the petitioners.

*L. William Fishman* and *Bernard Goldstein*, for the respondent.

The Commissioner determined deficiencies in petitioner's income tax in the amounts of $60,699.15 and $70,594.59 for the taxable years ending December 28, 1963, and January 2, 1965, respectively, and deficiencies in petitioner's withholding (section 1442(a)) tax in the amounts of $5,836.50 and $7,059.46 for the calendar years 1963 and 1964, respectively. The only issues remaining for decision are: (1) whether the Commissioner properly allocated income to petitioner, pursuant to section 482 of the 1954 Code, by reason of its participation in certain licensing arrangements with affiliated foreign companies; and (2) whether the free use by petitioner's brother-sister foreign organizations of certain intangible assets owned by it represented constructive dividends to the foreign parent company upon which petitioner was required to withhold income tax pursuant to section 1442(a) of the Code.

FINDINGS OF FACT

The parties have stipulated to certain facts and exhibits which are incorporated herein by this reference.

R. T. French Co. (French or petitioner) is a Delaware corporation engaged in the business of manufacturing and distributing various food products and other merchandise. Its principal business office was in Rochester, N.Y., at the time of the filing of its petition herein.

At all times prior to January 1, 1959, petitioner kept its books and filed its income tax returns on the basis of the calendar year. At all times on and after January 1, 1959, it has kept its books and filed its income tax returns on the basis of a fiscal year consisting of a period of 52 or 53 weeks beginning at the close of its preceding fiscal year and ending on the Saturday nearest to the 31st day of December in each calendar year. See section 441 (e) and (f), I.R.C. 1954. Unless otherwise indicated by the context, reference herein to a particular tax year of petitioner after 1958 without further identification will mean that fiscal year the greater portion of which was included in the par-

ticular year referred to (e.g., the "year 1964" means petitioner's fiscal year ending January 2, 1965).

For a number of years French has distributed certain instant mashed potato products in granular form—more fully described hereinafter—that it has manufactured under various processes derived from one invented by Theodore Rendle, an employee of Chivers & Sons Ltd. (Chivers), a British company. Chivers had acquired Rendle's British patent from him, and during World War II it engaged in the United Kingdom in the first successful effort to develop an instant mashed potato product that was exploited commercially. Chivers applied for a U.S. patent in 1943 and was granted such a patent on August 7, 1945, but never itself produced or marketed the product in this country.

Chivers had insufficient capital to put the new process fully into use on its own, and it made overtures to a British firm by the name of Reckitt & Colman Ltd., which had not only sufficient capital but also substantial overseas interests that were expected to contribute to foreign exploitation of the Rendle patents. Chivers and Reckitt & Colman Ltd. thus entered into a joint venture on or about January 1, 1946, organizing a new British company known as M.P.P. (Products) Ltd. (MPP) and to which Chivers transferred all of its rights in the British and U.S. patents relating to the Rendle process and also certain of the plant facilities it had earlier used in its modest implementation of that process. Chivers took 49 percent of the shares of MPP's capital stock and assumed chief responsibility for production and technical and research aspects of the new enterprise, and Reckitt & Colman Ltd. took 51 percent of the MPP stock and became in charge of marketing. MPP never had any employees of its own; its activities were carried on in its name by its parent companies. During the continuance of their joint venture in MPP, both Chivers and Reckitt & Colman Ltd. were represented on the MPP board of directors.

At all times relevant hereto until the year 1955, 55 percent of petitioner's outstanding capital stock was owned by J. & J. Colman Ltd., a British company, and the remaining 45 percent of such stock was owned by Reckitt & Sons Ltd., also a British company, or by a wholly owned subsidiary known as Reckitts (U.S.A.) Ltd. J. & J. Colman Ltd. and Reckitt & Sons Ltd. were then entirely independent of one another, and neither company possessed or exercised any control over the other through stock ownership or otherwise. They did, however, own or control the stock in Reckitt & Colman Ltd., referred to above, which, together with Chivers, had organized MPP.

In 1954 [1] J. & J. Colman Ltd. and Reckitt & Sons Ltd. were reorga-

---

[1] A possible conflict exists between the finding as to this date and the finding in the preceding paragraph that "until the year 1955" the stated percentages of petitioner's stock were owned by J. & J. Colman Ltd. and Reckitt & Sons Ltd. However, both findings are based upon the stipulation of the parties.

nized to form a single British company known as Reckitt & Colman (Holdings) Ltd., which from that time forward has controlled all of petitioner's stock either directly or through its subsidiaries. Reckitt & Colman (Holdings) Ltd. and its subsidiaries are sometimes collectively referred to hereinafter as the Reckitt & Colman group, or simply Reckitt & Colman; however, use of the term "Reckitt & Colman" in a context involving periods prior to 1954 is intended to refer to the company which, together with Chivers, had organized MPP in 1946.

On June 20, 1960, Reckitt & Colman acquired Chivers' 49-percent interest in MPP, and in December of 1961 all of the assets and business of MPP were consolidated by merger into one of the constituents of the Reckitt & Colman group, J. & J. Colman Ltd. (which was a different entity from the previously mentioned firm of the same name). After June 20, 1960, both French and MPP were thus 100-percent-owned by Reckitt & Colman interests. None of the aforementioned British companies, including Chivers, has been engaged in the conduct of any trade or business within the United States at any time relevant to these proceedings.

On August 13, 1946, French and MPP entered into a license agreement in respect of the Rendle mashed potato process. As previously indicated, all of French's stock was then owned by the two British companies which, through ownership of all of the stock in Reckitt & Colman, controlled 51 percent of the stock of MPP. Under the agreement, MPP in substance purported to grant to petitioner an exclusive license to manufacture and sell within the United States the instant mashed potato product in accordance with the so-called Rendle patent, and it undertook to provide the "know-how" required to work the process (including any improvements and further inventions), furnishing technical advice and assistance throughout the entire term of the agreement. The licensee agreed, without payment therefor, to make available to the licensor any improvements or further inventions which the licensee might discover. Although the U.S. patent was due to expire on August 7, 1962, the agreement was to run until June 1, 1967. The agreement required the licensee to pay a royalty of 3 percent of its net sales. It further provided that if the licensee's obligation to pay this royalty should terminate prior to June 1, 1967 (e.g., upon expiration of the patent in 1962), the licensee would be required, after such termination and until June 1, 1967, to pay a net amount of 1 percent of its net sales for the advice and assistance of the licensor relating to the production of the mashed potato product.

On December 13, 1956, the foregoing agreement was amended to change the amount of the royalty to 3 percent of net sales up to net

sales of $800,000 in any calendar year plus 2 percent of net sales of any excess over that amount in any such year.

On or about March 14, 1950, French had entered into a separate and unrelated agreement with Reckitt & Colman whereby the British firm undertook to supply French with the fruits of certain research it was conducting in areas apart from the mashed potato field and into which French was contemplating eventual expansion. French undertook to pay £5,000 a year under that agreement, and pursuant thereto it paid $13,984 and $13,951, for the years 1963 and 1964, respectively.

The Rendle process, as put into operation by French after 1946, entailed, in short, cooking and mashing of raw potatoes, admixture of the mash with "seed powder," and dehydration of the resulting material under carefully controlled conditions to yield granules that could be reconstituted into mashed potatoes suitable for consumption by the addition of water or milk. The entire process required approximately 2 hours. The "seed powder" consisted of the finished granules themselves, and the "adding back" of that powder was fundamental to the Rendle process. French obtained seed powder from MPP (or Chivers) until it produced sufficient amounts of powder to fulfill its own needs.

The Rendle process could not readily be instituted without special equipment and technical assistance, which French obtained from Chivers through MPP. In the latter connection, a Chivers employee named Frank Diver was sent to Rochester to help French set up a pilot operation late in 1946. During Diver's stay of approximately 2 months, he assisted in the erection of the equipment and instructed French personnel in all phases of the Rendle process.

French constructed a larger plant at Rochester for commercial production of potato granules during 1947, and operations at that facility commenced late in 1947 or early in 1948. Another Chivers employee, A. R. Williamson, made several brief visits to Rochester around that time to deal with matters similar to those with which Diver had been involved during his earlier visit, and a third Chivers representative, Commander William Hughes, became the permanent manager of the Rochester plant. Hughes thereafter drew no salary from Chivers; he continued to work for French until around 1958, by which time his annual salary amounted to approximately $12,000. After the larger plant was put into use, French sent samples weekly to be evaluated in the Chivers laboratories in order to assure that the quality of the French and MPP products were on a par.

Production of mashed potato granules was carried on at Rochester until 1952. By then it had become apparent that the variety of potato grown in that part of the country was not particularly well suited to

the Rendle process and that a more acceptable product could economically be made from Idaho russet potatoes. French accordingly discontinued operations at Rochester and entered into a subcontracting arrangement with the J. R. Simplot Co. whereby Simplot would take over the manufacture of granules in Idaho with French equipment and expertise. Production was thus carried on in Idaho with Simplot personnel, although Hughes transferred to the new plant to assure that the process was being properly handled and generally to oversee matters on behalf of French. No other employee of French was continuously present in Idaho during the time the Simplot arrangement remained in effect.

While production of mashed potato granules was being carried on by Simplot in Idaho, French was conducting research at Rochester that was hoped to lead to the replacement of the "batch" process then in use with a "continuous" process which would combine into one step the first two phases of the batch process—that is, the cooking and mashing of the raw potatoes and the adding back of the seed powder. The continuous process would not displace the basic Rendle process, but rather was seen simply as a refinement of it. With the aid of a New York engineering firm, Henry Peck Associates, which was compensated for its work on a fee basis, and also after consultations with Chivers researchers who themselves had been engaged in a similar project, French developed an acceptable continuous process by 1956 or 1957.

When it became apparent that the new process could successfully be employed, it was decided that French's contractual arrangement with Simplot would be "phased out" and that French, using the continuous process, would undertake the manufacture of instant mashed potatoes at a new plant at Shelley, Idaho, on its own behalf. During the early period of production at Shelley, A. R. Williamson of Chivers again came to the United States (his two or three visits consumed approximately 3 months in the aggregate) to contribute to the solution of certain technical problems relating to the new process and to assist generally with the transition. He also acquired expertise there that contributed to the institution of a similar process by MPP. Simplot, after the final severance of its relationship with French, has continued in the instant mashed potato field and since become a major competitor of French.

The development of the continuous process by French and Peck Associates in conjunction with Chivers was but one example of the continuing close cooperation between the French and Chivers research laboratories that was at least implicitly called for by the provisions of the August 13, 1946, license agreement covering the mutual exchanges of any improvements and further inventions. During its first

years in the instant mashed potato field, French had insufficient expertise to carry on its own research projects, and it drew instead on the efforts of Chivers researchers, whose work was done in MPP's interest. Thus, from 1946 to 1950, Dr. E. G. Williams of Chivers carried on basic research which ultimately led to the solution of certain problems that had been encountered in both England and the United States in respect of the deterioration of the packaged instant mashed potato product on the shelves of retail stores, namely, tendencies to become rapidly stale and acquire a distorted flavor and also to become brown in warmer climates. Williams discovered that the "staling" and "browning" effects could be avoided by packaging the product with an inert gas instead of ordinary air with an oxygen content and by reducing the moisture content of the packages. During the course of his research, Williams regularly transmitted progress reports to French, and French ultimately made use of his studies, in conjunction with certain U.S. container manufacturers, to develop a method of packaging that gave the product a much-improved shelf life. MPP was then selling its products only to bulk consumers and not to householders, so the results of the packaging studies in the United States were of no immediate use to it.

Various other research projects were undertaken by Chivers in the name of MPP during the 1940's, some of which generated results that were useful to French. French first began potato research in 1951 or 1952, and its activities in that field increased substantially throughout the 1950's. Its main research facilities were at Rochester, where, in addition to potato research, it was active in many other areas of inquiry related to its business.

French was the only U.S. producer of instant mashed potatoes until around 1956 or 1957. Thereafter, it encountered substantial competition in the household market from a newly developed kind of instant mashed potato product known as "potato flakes." Petitioner marketed under its label a line of flakes that was produced for it by another manufacturer. It produced no flakes itself, however, although it had done some research in the field in conjunction with Chivers. French also met competition in the field of granules, which continued to be popular among bulk consumers such as restaurants, schools, and jails. At the time of the trial herein, the granule market represented approximately two-thirds of the entire instant mashed potato market, and French held approximately 25 percent of the granule market.

On or about December 29, 1958, a lawsuit charging French with patent infringement was filed in the U.S. District Court for the District of Delaware by Templeton Patents, Ltd. The plaintiff was one of a number of British companies controlled by Robert Alexander Spencer Templeton, the successor in interest to certain British and U.S.

potato patents that were similar to, and allegedly preemptive of, the Rendle patents. Templeton Patents alleged in its complaint that a "reasonable royalty for the right to employ the inventions of the [Templeton] patents in suit is the sum of five cents for each pound of improved reconstitutable dried potato product produced utilizing said inventions" and that a "pound of potato product produced by utilizing the inventions claimed in [Templeton's] patents sells at retail for approximately sixty cents a pound, is sold by the defendants * * * for aproximately thirty cents a pound, and costs said defendants approximately twenty cents a pound to produce." French denied the foregoing allegations and the fact of the alleged infringement in its answer, and claimed that the Templeton patents were invalid and unenforceable against French for a variety of stated reasons.

The Templeton suit was settled by the parties without trial and dismissed with prejudice by court order of January 31, 1961. A written agreement entered into on January 4, 1961, between French, MPP, Templeton Patents, and Robert Alexander Spencer Templeton provided for the disposition of certain past, present, and future controversies (including the aforementioned litigation) between members of the Reckitt & Colman group (including French & MPP) on the one hand, and the various Templeton companies, on the other. The only monetary payment called for by the agreement was a $65,000 payment by French to Templeton Patents.

Sometime during the pendency of the Templeton Patents suit, MPP was involved in similar litigation in England with another Templeton company. The eventual settlement of that lawsuit involved the payment of an insubstantial amount by MPP to the Templeton company, but otherwise left the parties in the same relative positions as they had been before the case was brought. Prior to the settlement of the U.S. and British suits, however, an attorney representing French in the Templeton Patents case came to the conclusion that the making of certain modifications in the August 13, 1946, license agreement between French and MPP would enable French to mount a more effective defense against certain issues that had arisen in the British litigation and were expected to be raised in the U.S. litigation. It appeared that the strength of the plaintiff's case against French depended in large part upon the extent to which French was in fact and in form making use of the Rendle patents. The processing methods by then practiced by French were, in fact, somewhat different from the process outlined in the Rendle patents, and counsel for French desired as well to convert the agreement with MPP into one in respect of "knowhow" only and to eliminate the earlier provisions mentioning the exclusive license under the patents. A draft of a new agreement was thus prepared and submitted to an executive of Reckitt & Colman

under a cover letter dated March 17, 1960. The agreement was executed on December 21, 1960—while the Templeton Patents suit was still pending and after both French and MPP had become 100-percent-controlled by Reckitt & Colman interests. It provided, in relevant part, as follows:

WHEREAS, the parties have previously entered into an agreement dated August 13, 1946; and

WHEREAS, the parties desire to cancel such agreement and to enter into an agreement on the terms and conditions hereinafter set forth; and

WHEREAS, M.P.P. is possessed of certain information, knowledge, technical data, and know-how relating to the manufacture of mashed potato powder; and

WHEREAS, FRENCH desires to obtain a license to use such information, knowledge, technical data, and know-how on the terms and conditions hereinafter set forth;

Now, THEREFORE, it is agreed by the parties hereto as follows:

1. The agreement between M.P.P. and FRENCH, dated August 13, 1946, is hereby terminated and cancelled, except for FRENCH's obligation to pay to M.P.P. royalties heretofore accrued under that agreement.

2. M.P.P. hereby grants to FRENCH a nonexclusive license under M.P.P.'s information, knowledge, technical data, and know-how for the manufacture of mashed potato powder (hereinafter called "the licensed process"), and to use and sell mashed potato powder so manufactured (hereinafter called "the licensed product").

3. FRENCH agrees to pay to M.P.P. a royalty at the rate hereinafter specified of the net price at which the licensed product shall be sold by FRENCH * * *. The rate referred to at the beginning of this paragraph shall be 2% on sales made up to December 31, 1961 and 1% on sales thereafter made up to the expiry date as determined under paragraph 12 hereof.

 *  *  *  *  *  *  *

7. M.P.P. shall at the request of FRENCH disclose or procure to be disclosed to such of the directors and employees of FRENCH as FRENCH may consider necessary the whole of the licensed process and of the method of operation thereof. M.P.P. also agrees to advise and assist FRENCH in all matters relating to the method of working the licensed process, improvement of production, and generally regarding the manufacture of the licensed product.

 *  *  *  *  *  *  *

9. During the continuance of this license, M.P.P. shall forthwith disclose to FRENCH all future improvements or inventions, whether patentable or not, relating to the licensed process which M.P.P., or any employee of M.P.P. to the benefit of whose inventions M.P.P. is entitled, may discover or make, or which may be brought to M.P.P.'s knowledge and which M.P.P. shall be at liberty to disclose * * *

10. During the continuance of this license, FRENCH shall forthwith disclose to M.P.P. all improvements or inventions, whether patentable or not, relating to the licensed process which FRENCH, or any employee of FRENCH to the benefit of whose inventions FRENCH is entitled, may discover or make or which may be brought to FRENCH's knowledge and which FRENCH shall be at liberty to disclose * * *

 *  *  *  *  *  *  *

12. This agreement shall continue in full force until June 1, 1967 * * *

The U.S. patent on the Rendle process held by MPP expired on August 7, 1962. Had the original license agreement of August 13, 1946, then remained in force, the expiration of the patent upon which it was based presumably would have rendered inoperative the exclusive license provisions of that agreement and activated instead the "know-how" provisions establishing the 1-percent royalty. Thus, apart from modification of the royalty rate during the period December 21, 1960 (date of execution of the new agreement), to August 7, 1962 (date of expiration of the U.S. patent), the terms of the December 21, 1960, agreement left the relative rights and obligations of the parties substantially the same as they would have been under the prior agreement.

The benefits of the potato research that had been carried on at the Chivers laboratories ceased to be available to French and MPP following Chivers' withdrawal from the MPP joint venture on June 20, 1960. Mashed potato research was taken up, however, at the British research laboratories of J. & J. Colman Ltd., the Reckitt & Colman (Holdings) Ltd. subsidiary that eventually absorbed MPP. MPP and French thus continued their close cooperation in potato research through J. & J. Colman Ltd. at least until June 1, 1967, when the December 21, 1960, agreement was to expire.

The research projects undertaken after 1960 included efforts by both the French and J. & J. Colman Ltd. laboratories to develop more easily reconstitutable products and means of preventing raw potatoes from sprouting while being stored prior to processing. In addition, French and Peck Associates pursued their studies of the continuous process, and refinements of that process were made from time to time and communicated to the British laboratories. A process for using unpeeled potatoes was developed by the J. & J. Colman Ltd. laboratories and tested by French, but was ultimately abandoned. Some further work on potato flakes was done in England, where a particular demand for products based on flakes was foreseen. Extensive cooperation between the French and J. & J. Colman Ltd. laboratories and full disclosure of results to the other typified all of the research projects undertaken by the British and U.S. laboratories.

French produced approximately 1,200 tons of instant mashed potato product during each of its first few years of potato operations; that average increased to approximately 2,000 tons per year during the period of the Simplot subcontract. Production figures rose considerably after institution of the continuous process, and at the time of the trial herein French produced approximately 20,000 tons per year of instant mashed potato product. MPP produced about 4,000–6,000 tons per year until around 1950; its production thereafter leveled off at approximately 2,500–3,000 tons per year.

MPP entered into one other agreement during the 1940's authorizing the exploitation of its mashed potato expertise by another organization. That agreement, with an unrelated firm based in Paris, France, known as "Produsol," was executed on February 21, 1949, and terminated approximately 4 years later after "Produsol" found itself unable to market the product in France. Like the agreement with petitioner of December 21, 1960, the "Produsol" contract was not expressly based upon any patent. As translated from the original French into English, it provided, in part, as follows:

1. M.P.P. will * * * apprise the qualified representatives of "Produsol" of the secret process for manufacturing the product called "M.P.P.", and will thereafter keep "Produsol" advised of improvements * * *

2. M.P.P. will also give "Produsol" all information and technical assistance necessary to enable it to manufacture the product according to the best known methods which it uses itself * * *

> *      *      *      *      *      *      *

5. "Produsol" agrees to advise M.P.P. without delay of all information * * * concerning the improvements it may achieve or acquire itself in the M.P.P. production processes. * * *

6. "Produsol" agrees to establish, upon signing these presents, in a factory already in existence or to be built in France, an installation for the manufacturing of the M.P.P. product with a production capacity of 400 tons (English measure) annually * * *

> *      *      *      *      *      *      *

8. In return for the advantages hereinabove set forth, "Produsol" will pay to M.P.P. an advance of 5% on the net sale price of all potato products manufactured and sold during the period of the present agreement. * * *

> *      *      *      *      *      *      *

10. In the event "Produsol" should decide to increase production of mashed potato powder beyond the capacity provided for the equipment established in accordance with article 6 hereinabove, this increase must be a minimum of 1,000 English tons per annum, and in this case "Produsol" agrees to give M.P.P. the option to participate, either itself or through any persons or companies designated by it, under the same conditions as all other subscribers and up to 50%, in the subscription of capital of any new company which may be formed to acquire the fixed assets and tangible assets of "Produsol" * * *

If M.P.P. exercises this option, the royalty payment hereinabove provided will be reduced by 2½% as soon as the new installation has attained actual production of 1,000 English tons per annum. If the option is not exercised within a period of six months after "Produsol" has advised M.P.P. in writing of its intention to increase production, "Produsol" will continue to pay royalties at the rate of 5% on the entirety of the production.

The following table reflects the annual dollar volume of mashed potato sales in respect of which petitioner made payments claimed as royalties during its taxable years 1948–64, the rate applied by petitioner (pursuant to its various agreements with MPP) in computing the amounts of those payments, and the annual payments made and

claimed by petitioner as deductions on its Federal income tax returns
for each respective year:

| Year | Sales | Rate | Payments |
|------|-------|------|----------|
| 1948 | $524,185 | 3% | $15,726 |
| 1949 | 841,982 | " | 25,259 |
| 1950 | 669,115 | " | 20,073 |
| 1951 | 1,203,804 | " | 36,093 |
| 1952 | 1,228,393 | " | 36,852 |
| 1953 | 838,725 | " | 25,162 |
| 1954 | 931,378 | " | 27,941 |
| 1955 | 1,838,271 | " | 55,148 |
| 1956 | 2,286,554 | (3% on $800,000) (2% on excess) | 53,731 |
| 1957 | 3,975,249 | " | 87,505 |
| 1958 | 8,739,878 | " | 182,798 |
| 1959 | 4,332,076 | " | 94,642 |
| 1960 | 8,460,103 | " | 177,202 |
| 1961 | 8,998,919 | 2% | 179,978 |
| 1962 | 9,374,967 | 1% | 93,750 |
| 1963 | 9,805,836 | " | 98,058 |
| 1964 | 12,162,345 | " | 121,623 |

The Commissioner disallowed none of the deductions claimed by
French in respect of the payments made during the taxable years
1948–62. In his deficiency notices to petitioner for each of the tax-
able years 1963 and 1964 (ending December 28, 1963, and January 2,
1965, respectively) he determined that—

you engaged in transactions with your affiliate whereby you made payments to
said affiliate designated on your return as "license fees" [for 1963, or "license
fees and royalties," for 1964]. Said transactions were not made at arms length.
Under the authority of Section 482 of the 1954 Code additional gross income is
allocated to you in the amount of $98,058.00 [for 1963, and $121,623.00, for 1964],
which allocation is necessary to clearly reflect your income and the income of
your affiliate.

The figures shown in the above table for payments made in fiscal 1963
and 1964 do not include any amounts paid by petitioner under its
March 14, 1950, agreement with Reckitt & Colman; those items
($13,984 and $13,951 for each respective year) were separately de-
ducted on petitioner's tax returns.

For each of the years 1963 and 1964, petitioner formally declared
and paid dividends of $1,750,000 in the aggregate to its stockholders
in the Reckitt & Colman group. It duly reported those payments on its
respective United States Annual Returns of Income Tax to be Paid
at Source (Treasury Forms 1042) and withheld tax thereon at the
rate of 5 percent. The parties are agreed that if the Commissioner's
determination in respect of the claimed royalty payments for 1963
and 1964 ($98,058 and $121,623, respectively) is sustained, then those
amounts, which were actually paid, are to be treated as dividends and
subjected to withholding of additional tax at the source at the rate
of 5 percent.

The Commissioner also determined, under the authority of section

482, that petitioner received additional income of '$18,671.90 and $19,566.18 in 1963 and 1964, respectively, by reason of the free use of its "trademarks, patents, know-how, etc." by its foreign "brother-sister" affiliates. The foregoing amounts represented percentages of the affiliates' net sales, as computed by the Commissioner. The affiliates do not intend ever to pay those amounts to petitioner. Such amounts and the consideration for which they were paid appear to be unrelated to the instant mashed potato business involved in the principal issue herein. Petitioner does not now contest the Commissioner's determination that it received additional income, but it does contest his further determination that the free use of the intangibles referred to gave rise to "constructive dividends" to the English parent which are subject to "the 5% withholding tax under section 1442(a) of the 1954 Code as modified by Article VI of the United States-United Kingdom Tax Treaty as then in effect." Petitioner had earned surplus at the end of each year greatly in excess of the amounts of the so-called "constructive dividends."

#### OPINION

RAUM, *Judge:* 1. Section 482 of the 1954 Code [2] empowers the Commissioner to allocate income between or among commonly controlled organizations if he determines that such allocation "is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations." The critical inquiry for the purpose of revealing distortions in income, whether or not such distortions may have resulted from tax-avoidance considerations, is generally whether the transaction in question would have been similarly effected by parties dealing at arm's length. See *Huber Homes, Inc.*, 55 T.C. 598, 605, 606; *L. E. Shunk Latex Products, Inc.*, 18 T.C. 940, 956; secs. 1.482–1(a) (6), 1.482–1(b)(1), and 1.482–1(c), Income Tax Regs. It is by that standard that the royalty payments here in issue must be measured. See secs. 1.482–2(b)(1) and 1.482–2(d)(1)(i), Income Tax Regs. We hold that those payments were made pursuant to agreements such as would have been negotiated and entered into by parties dealing at arm's length, and that the Commissioner's contrary determination cannot stand.

---

[2] SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS.

In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses. See also Convention with the United Kingdom Respecting Double Taxation and Taxes on Income, Apr. 16, 1945, art. IV, 60 Stat. 1377, 1380, T.I.A.S. No. 1546.

The Commissioner's determination is initially subject to attack under those decisions suggesting that section 482 is not an appropriate tool for the mere disallowance of a claimed deduction, e.g., *Hypotheek Land Co.* v. *Commissioner*, 200 F. 2d 390, 396 (C.A. 9), reversing 16 T.C. 1268; *Chicago & North Western Railway Co.*, 29 T.C. 989, 997–998; *General Industries Corporation*, 35 B.T.A. 615, 617;[3] for, by "allocating" to petitioner additional gross income in amounts equal to the deductions it claimed in 1963 and 1964 in respect of its royalty payments, the Commissioner has, in effect, simply disallowed the claimed deductions. However, his determination might nonetheless be supported on a different theory, namely, that the payments did not represent "ordinary and necessary" business expenses under section 162(a) of the Code. See *Stearns Magnetic Mfg. Co.* v. *Commissioner*, 208 F. 2d 849, 851–852 (C.A. 7), reversing and remanding a Memorandum Opinion of this Court; *Robert Lee Merritt*, 39 T.C. 257, 269–270, reversed on another issue 330 F. 2d 161 (C.A. 4), which was in turn reversed sub nom. *Paragon Jewel Coal Co.* v. *Commissioner*, 380 U.S. 624; *Differential Steel Car Co.*, 16 T.C. 413, 423–425; *Granberg Equipment, Inc.*, 11 T.C. 704, 713–714; Rev. Rul. 69–513, 1969–2 C.B. 29.[4] It is clear from the foregoing authorities that the "arm's length" test commonly associated with section 482 is equally applicable in ascertaining the "ordinary and necessary" character of a payment to a related entity. Although the deficiency notice was explicitly founded upon section 482, petitioner, far from insisting that it has been unfairly surprised by the belated introduction of section 162 into the case, has framed a principal argument in its original brief in terms of that section. Cf. *Kerry Investment Co.*, 58 T.C. 479, 493; *Richard Rubin*, 56 T.C. 1155, 1163–1164, affirmed per curiam 460 F. 2d 1216 (C.A. 2).[5] It is therefore unnecessary for us to express any opinion as to the appropriate role of section 482 in the context of this case, for the substantive decisional criteria relevant to the present controversy are

---

[3] The attitude toward sec. 482 revealed in the cited cases is analogous to that reflected in such decisions as *Huber Homes, Inc.*, 55 T.C. 598, 607–610, and *Kahler Corp.*, 58 T.C. 496, 507–508, nonacq. 1972–2 C.B. 3, which held that sec. 482 may not be used to "create" hypothetical income for a member of a controlled group in a case where the group as a whole derived no income from dealings with third parties that could be related to non-arm's-length transactions within the group. See also *Kerry Investment Co.*, 58 T.C. 479, 490–491, nonacq. 1972–2 C.B. 3. But see *B. Forman Co.* v. *Commissioner*, 453 F. 2d 1144, 1155–1156 (C.A. 2), certiorari denied 407 U.S. 934, rehearing denied 409 U.S. 899, reversing in this connection 54 T.C. 912.

[4] See also *The Nestle Co., Inc.*, 22 T.C.M. 46, 59.

[5] In any event it is well established in this connection that a deficiency may be sustained on grounds other than those relied upon by the Commissioner or even where the grounds advanced by him may be incorrect. See *Wilkes-Barre Carriage Co.*, 39 T.C. 839, and cases cited at pp. 845–846, affirmed 332 F. 2d 421 (C.A. 2); *Estate of Dorothy E. Beck*, 56 T.C. 297, 374; *Adirondack League Club*, 55 T.C. 796, 813–814 (concurring opinion), affirmed 458 F. 2d 506 (C.A. 2).

identical in whichever posture the matter is viewed.[6] Cf. *Sparks Nugget, Inc.* v. *Commissioner*, 458 F. 2d 631, 634 (C.A. 9), affirming a Memorandum Opinion of this Court, certiorari denied sub nom. *Graves* v. *Commissioner*, 410 U.S. 928.

The single distinction between sections 162 and 482, for present purposes, relates to the measure of proof that must be offered by the petitioner in order to overcome the presumptive correctness of the Commissioner's determination. The petitioner bears a heavier burden in seeking to overturn a determination under section 482, for it is well settled that the "Commissioner has considerable discretion in applying this section and his determinations must be sustained unless he has abused his discretion. We may reverse his determinations only where the taxpayer proves them to be unreasonable, arbitrary, or capricious." *Pauline W. Ach*, 42 T.C. 114, 125–126, affirmed 358 F. 2d 342 (C.A. 6), certiorari denied 385 U.S. 899; see also *B. Forman Co.* v. *Commissioner*, 453 F. 2d 1144, 1151–1152 (C.A. 2), reversing in part and affirming in part 54 T.C. 912, certiorari denied 407 U.S. 934, rehearing denied 409 U.S. 899; *Philipp Brothers Chemicals, Inc. (N.Y.)* v. *Commissioner*, 435 F. 2d 53, 57 (C.A. 2), affirming 52 T.C. 240; *Dillard-Waltermire, Inc.* v. *Campbell*, 255 F. 2d 433, 435–436 (C.A. 5); *Grenada Industries, Inc.*, 17 T.C. 231, 255, affirmed 202 F. 2d 873 (C.A. 5), certiorari denied 346 U.S. 819. In our judgment, however, the record firmly supports the petitioner's position that its royalty payments were made in circumstances as would have existed between parties dealing at arm's length, and, assuming that the standard of review more favorable to the Commissioner is in fact applicable here, we think that his determination must nonetheless be disapproved.

Petitioner first entered into a license agreement covering a process for the manufacture of an instant mashed potato product in 1946. The licensor under that agreement was a British company known as MPP; it held British and U.S. patents on the process and marketed instant mashed potatoes in Great Britain. In 1946, 51 percent of the shares of stock in MPP was owned by the British firm of Reckitt & Colman Ltd., which itself was jointly owned by two unrelated British companies then controlling 55 percent and 45 percent, respectively, of the outstanding capital stock in petitioner. The remaining 49 percent of MPP's stock was held by yet another independent British firm, Chivers & Sons Ltd.

The 1946 agreement was to remain in force for approximately 20 years. Its provisions related to two separate periods of the 20-year

---

[6] The manner in which secs. 162 and 482 intersect, at least for purposes of this case, is thus to be distinguished from situations involving the relationship between sec. 482 and the far more general principles of sec. 61(a). Cf. *Rubin* v. *Commissioner*, 429 F. 2d 650, 653–654 (C.A. 2), reversing and remanding 51 T.C. 251; *Grenada Industries, Inc.*, 17 T.C. 231, 252–253, affirmed 202 F. 2d 873 (C.A. 5), certiorari denied 346 U.S. 819.

term, the first and principal one of which ended with the termination of the patent. Under the main part of the agreement, MPP granted to petitioner an exclusive license to work, use, and exercise the patented process and to sell the product made in accordance therewith within the United States, and MPP further agreed "to advise and assist the Licensee in all matters relating to the method of working the said process, improvement of production, and generally regarding the manufacture of cooked potato products" (punctuation supplied). In consideration of MPP's undertakings, petitioner was to pay MPP a royalty at a rate of 3 percent of petitioner's net sales of potato products manufactured under the patented process.

There is no dispute between the parties to these proceedings that the foregoing provisions were to lapse upon the expiration of MPP's U.S. patent on the instant mashed potato process (which occurred on August 7, 1962) and that supplemental provisions in the 1946 agreement, relating to "know-how" only, were thus to become operative and to remain in force for the duration of the agreement. There was nothing in the supplemental provisions relating to an exclusive license; MPP's undertakings under those provisions were limited to the rendition of advice and assistance, as specified in the above-quoted clause from the main part of the agreement. The royalty rate was thus to be reduced to 1 percent. The 1946 agreement also contained provisions, operative "During the continuance of this Licence," pursuant to which MPP and petitioner were to disclose to the other all "improvements" and "further inventions" related to the process that might in any manner become known to either party.

The Commissioner does not seriously contend that the 1946 agreement was not representative of an arm's-length bargain. To be sure, the opportunity may have existed for petitioner's two unrelated British parent companies, which also jointly owned the company holding a majority of MPP's stock, to cause petitioner to agree to an arrangement that unfairly favored MPP, but it seems unlikely that petitioner's parent companies would have done so, because they would thus have been diverting funds from a corporation (petitioner) in which they were the sole stockholders to another corporation (MPP) in which a stranger (Chivers) owned 49 percent of the stock. The position of Chivers in the scheme of things in all likelihood assured the arm's-length character of the transaction.[7]

---

[7] The matter here considered is entirely different from the superficially similar situation in *B. Forman Co.* v. *Commissioner*, 453 F. 2d 1144, 1153–1155 (C.A. 2), reversing in this connection 54 T.C. 912. There two unrelated corporations were the sole stockholders in a third corporation, and thus were together in control of that corporation; and the point on which the Tax Court and the Court of Appeals disagreed was whether the three corporations were to be considered as controlled "by the same interests" for purposes of sec. 482. The question before us is whether, as a practical matter, the 1946 agreement was in fact such as might have been entered into at arm's length, and in this respect the 49-percent adverse interest of Chivers in MPP becomes highly relevant.

Moreover, the only other agreement entered into by MPP authorizing the exploitation of its mashed potato process by another organization was with a wholly unrelated company known as "Produsol," and the terms of that agreement were at least as favorable to MPP as those of its agreement with petitioner. The "Produsol" agreement, executed in 1949, included no exclusive license provisions based on any patent, but rather was one covering "know-how" only. Like the agreement with petitioner, it was to remain in force for 20 years and provided for each party to inform the other of any discovered "improvements" upon the MPP process. The royalties payable by "Produsol" in return for the benefits it was to receive, which were, if anything, less comprehensive than those promised to petitioner, were greater than those to be paid by petitioner.

In view of the "Produsol" agreement, it is prima facie apparent that the 1946 agreement was not at all unreasonable, at least from petitioner's standpoint. In later years, to be sure, MPP (through Chivers) derived substantial benefits from petitioner's own considerable research efforts, and, in *Templeton Patents, Ltd.* v. *J. R. Simplot Co.*, 336 F. 2d 261 (C.A. 9, 1964), affirming 220 F. Supp. 48 (D. Idaho 1963), a process closely resembling the one licensed in 1946 was found to be based on principles already available to the public and therefore not patentable.[8] The process controlled by MPP, however, was apparently not so well known even in 1949 that "Produsol" was unwilling to pay for it,[9] and the subsequent developments in the relationship between petitioner and MPP suggest only that petitioner might have secured the license on even more advantageous terms if the contracting parties had been able to foresee those developments in 1946. What later transpired in no way detracted from the reasonableness of the agreement when it was made.

The royalty provisions of the 1946 agreement were modified by an agreement executed in 1956, by which time petitioner's two British parent companies had merged. The 1956 agreement called for payments at the old rate of 3 percent upon only the first $800,000 in annual sales and at 2 percent upon annual sales in excess of that amount. The record is silent as to the reason for that change, but whatever the reason, the parties do not appear to have attributed any consequence to it in respect of the issue before us. However, the 1956 modification, in any event, only made the 1946 agreement comparatively more attractive to petitioner.

---

[8] The *Templeton-Simplot* opinions discussed the process extensively, referring to at least three other patents, identified as the Faitelowitz patent, the Volpertas patent, and the Rivoche patent. Nowhere is there any mention of the Rendle patent, involved herein. A reading of those opinions raises a question whether Rendle was really the inventor of the process. However, mystified as we are by these circumstances, the findings that we made herein are based, as they must be, only on the record that is before us.

[9] Cf. *The Nestle Co., Inc.*, 22 T.C.M. 46, 62–63.

The final revisions in the contractual arrangements between petitioner and MPP, which resulted in the agreement under which the payments here in issue were made, were effected in 1960, after both petitioner and MPP had come fully within the common control of the same British interests. The 1960 agreement superseded the 1946 agreement and was to remain in force for the duration of the period covered by the earlier instrument. It granted to petitioner "a non-exclusive license under M.P.P.'s information, knowledge, technical data, and know-how" for the manufacture and sale of the same instant mashed potato product that had been the subject of the 1946 agreement and provided for royalties to be paid at rates (2 percent on sales made up to December 31, 1961, and 1 percent on sales made thereafter) that were roughly comparable to those called for by the 1946 agreement, at least under the supplemental provisions that were to become effective in August of 1962. The 1960 agreement further contained reciprocal covenants, similar to those in the earlier agreement, relating to disclosure of "improvements or inventions" in connection with the licensed process.

The principal effect of the contractual modifications made in 1960 was thus to eliminate references in the 1946 agreement to the patents held by MPP, and the record makes it clear that the sole purpose of the 1960 changes was to bolster petitioner's defense to patent infringement charges that had been brought against it by an unrelated company. The Commissioner does not seriously dispute that such was the purpose of the 1960 agreement, nor does he deny that the rights and obligations of the parties under that agreement were little different in substance from those set forth in the 1946 agreement or that the royalties paid by petitioner during the particular taxable years here in issue would have been computed in precisely the same manner under either agreement.

Plainly, the mere fact that petitioner and MPP were controlled by the same interests at the time the 1960 agreement was executed is an insufficient ground for disallowance of the claimed royalty deductions so long as the "arm's length" test is met. Cf. *L. E. Shunk Latex Products, Inc.*, 18 T.C. 940, 957; *Grenada Industries, Inc.*, 17 T.C. 231, 254–255, affirmed 202 F. 2d 873 (C.A. 5), certiorari denied 346 U.S. 819. Had petitioner been contractually bound to an unrelated licensor when its patent infringement difficulties arose prior to 1960, there would still be every reason to believe that it might have successfully prevailed upon such a licensor to consent to a modification of the 1946 agreement deleting the troublesome references to the patents. But such consent surely could only have been procured if the licensor's rights undr the prior contract were left substantially unimpaired.

And it was just that sort of arrangement that was in fact settled upon in 1960 by petitioner and MPP, apart from the interim modification of the rate of royalties until the time of expiration of the patent in 1962.[10]

The Commissioner has focused on the particular taxable years in question, 1963 and 1964, and pointed out that petitioner received no significant benefits in those years in return for its royalty payments, that the process licensed under the 1946 agreement was by then widely understood throughout the food industry and therefore of little or no marketable value, and that petitioner had by then developed an impressive potato research capability of its own, the fruits of which it generally made available to its English affiliate without receiving any royalties. The point is, however, that it is inappropriate to view 1963 and 1964 in isolation. The royalties were not necessarily paid for value received during those particular years; rather, they were paid pursuant to valid commitments reasonably undertaken by petitioner as if it had dealt with MPP at arm's length. There is no reason to believe that an unrelated party in MPP's position would have permitted petitioner to avoid its contractual obligations at any time prior to the expiration date of the 1946 and 1960 agreements. The Commissioner's determination therefore cannot stand. Cf. *Consolidated Apparel Co.* v. *Commissioner*, 207 F. 2d 580, 583–584 (C.A. 7), reversing in this connection 17 T.C. 1570.

2. In addition to the allocation under section 482 dealt with above, the Commissioner has also allocated to petitioner additional income ($18,671.90 and $19,566.18) for the years 1963 and 1964, respectively, representing 1 percent of the net sales of its foreign "brother-sister" affiliates that had free use of petitioner's "trademarks, patents, know-how, etc.," in respect of matters which appear to be unrelated to the mashed potato business. Petitioner is not now contesting that determination. The Commissioner has also determined, however, that the affiliates' free use of these intangibles represented a "constructive dividend" flowing from petitioner to the common British parent and that peti-

---

[10] We find the Commissioner's arguments based on *Brulotte* v. *Thys Co.*, 379 U.S. 29, rehearing denied 379 U.S. 985, which held the royalty provisions of a patent-licensing agreement unenforceable for the period beyond expiration of the patent, to be without merit. Unlike the licensing agreement involved in *Brulotte*, the 1946 agreement provided for royalties to be paid after expiration of the patent only in respect of "know-how" and at a substantially reduced rate, and the agreement contained no provisions comparable to those in the *Brulotte* license that were designed to project the patent monopoly beyond the patent's expiration by withholding its benefits from the public domain. But even if the post-expiration royalty provisions of the 1946 and 1960 agreements were unenforceable under *Brulotte*, it would not follow, as the Commissioner contends, that they would not have been agreed to by petitioner if it had been dealing at arm's length with an unrelated licensor. The *Brulotte* decision was not rendered until Nov. 16, 1964, well after the agreements were executed and nearly at the end of the period for which the royalties here in issue were paid.

tioner was required to withhold income tax thereon under section 1442 (a) of the Code (as modified by article VI of the relevant tax treaty).[11]

It is stipulated that petitioner will never actually receive the income that has been imputed to it under section 482, but the Commissioner's theory is that "petitioner has constructively received that amount [and] passed it constructively to the common parent which has, by permitting its foreign subsidiaries to keep the funds, increased its capital in the petitioner's foreign brother-sister affiliates."

It has been held that a distribution by a corporation to a "brother-sister" corporation will be regarded as a dividend to the common shareholder only if the distribution was made for the benefit of the shareholder. See *Sammons* v. *Commissioner*, 472 F. 2d 449, 451–452 (C.A. 5), affirming in this respect a Memorandum Opinion of this Court; *Sparks Nugget, Inc.* v. *Commissioner*, 458 F. 2d 631, 637–638 (C.A. 9), affirming a Memorandum Opinion of this Court, certiorari denied sub nom. *Graves* v. *Commissioner*, 410 U.S. 928; *Biltmore Homes, Inc.* v. *Commissioner*, 288 F. 2d 336, 340–341 (C.A. 4), certiorari denied 368 U.S. 825, affirming a Memorandum Opinion of this Court; *Clayton E. Greenfield*, 60 T.C. 425, 434–435; *Glenn E. Edgar*, 56 T.C. 717, 758–759; *PPG Industries, Inc.*, 55 T.C. 928, 1002–1003; *W. B. Rushing*, 52 T.C. 888, 893, affirmed on other issues 441 F. 2d 593 (C.A.

---

[11] SEC. 1442. WITHHOLDING OF TAX ON FOREIGN CORPORATIONS.

(a) GENERAL RULE.—In the case of foreign corporations subject to taxation under this subtitle, there shall be deducted and withheld at the source in the same manner and on the same items of income as is provided in section 1441 * * * a tax equal to 30 percent thereof * * *.

Sec. 1441 provides, in relevant part, as follows :
SEC. 1441. WITHHOLDING OF TAX ON NONRESIDENT ALIENS.

(a) GENERAL RULE.—* * * all persons, in whatever capacity acting * * * having the control, receipt, custody, disposal, or payment of any of the items of income specified in subsection (b) (to the extent that any of such items constitutes gross income from sources within the United States), of any nonresident alien * * * shall * * * deduct and withhold from such items a tax equal to 30 percent thereof * * *.

(b) INCOME ITEMS.—The items of income referred to in subsection (a) are * * * dividends * * *.

Prior to amendment, art. VI(1) of the Convention with the United Kingdom Respecting Double Taxation and Taxes on Income, Apr. 16, 1945, 60 Stat. 1377, 1381, T.I.A.S. No. 1546, provided as follows :

(1) The rate of United States tax on dividends derived from a United States corporation by a resident of the United Kingdom who is subject to United Kingdom tax on such dividends and not engaged in trade or business in the United States shall not exceed 15 percent : Provided that such rate of tax shall not exceed five percent if such resident is a corporation controlling, directly or indirectly, at least 95 percent of the entire voting power in the corporation paying the dividend, and not more than 25 percent of the gross income of such paying corporation is derived from interest and dividends, other than interest and dividends received from its own subsidiary corporations. Such reduction of the rate to five percent shall not apply if the relationship of the two corporations has been arranged or is maintained primarily with the intention of securing such reduced rate.

See also sec. 507.2(d)(1), Treas. Regs., and sec. 1.1441–6(a), Income Tax Regs.

Art. VI of the treaty was superseded by a new provision established by art. 4 of the Supplementary Protocol signed on Mar. 17, 1966, [1966] 17 U.S.T. 1254, 1257, T.I.A.S. No. 6089. However, the amended provision is applicable only to years subsequent to those in issue. See art. 18(2)(b)(i) of the Supplementary Protocol, [1966] 17 U.S.T. at 1267.

5); cf. *Worcester* v. *Commissioner*, 370 F. 2d 713, 715 (C.A. 1), affirming in this respect a Memorandum Opinion of this Court; *George R. Tollefsen*, 52 T.C. 671, 681, affirmed 431 F. 2d 511 (C.A. 2), certiorari denied 401 U.S. 908.

The dividends actually declared and paid by petitioner in each of the years in issue ($1,750,000 in each year) were so vastly in excess of the additional amounts that the Commissioner would treat as dividends to petitioner's parent corporation ($18,671.90 in 1963 and $19,566.18 in 1964) that we cannot believe that the free use of petitioner's intangibles represented an attempt by the parent to direct further benefits to itself. It can only be inferred that whatever benefits the parent may have received from these arrangements between its subsidiaries were merely derivative in nature, and it is clear under the foregoing authorities that "constructive dividend" treatment is therefore uncalled for. There being no dividend, petitioner had no duty to withhold any tax. We therefore do not consider the tantalizing question whether it would have been possible for petitioner to "withhold" the required 5 percent in the circumstances of this case.

*Decisions will be entered under Rule 50.*